## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANCHORAGE SCHOOL DISTRICT, | |
| CINCINNATI PUBLIC SCHOOLS, | |
| FAIRBANKS NORTH STAR BOROUGH, | |
| KUSPUK SCHOOL DISTRICT, | |
| AFT PENNSYLVANIA, | |
| CALIFORNIA FEDERATION OF TEACHERS, | |
| ILLINOIS FEDERATION OF TEACHERS, | |
| FLORIDA EDUCATION ASSOCIATION, | |
| FLORIDA PTA, | |
| NYSUT, | |
| OHIO FEDERATION OF TEACHERS, | |
| P.S. 305, | Case No. _____ |
| RHODE ISLAND FEDERATION OF TEACHERS AND HEALTH PROFESSIONALS, and | |
| TEXAS AMERICAN FEDERATION OF TEACHERS, | |
| *Plaintiffs*, | |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, | |
| LINDA MCMAHON, in her official capacity as Secretary of Education, | |
| OFFICE OF MANAGEMENT AND BUDGET, and | |
| RUSSELL VOUGHT, in his official capacity as OMB Director, | |
| *Defendants*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      In the Elementary and Secondary Education Act (ESEA), Congress created a host of formula grant programs to support schools, students, and teachers nationwide. These programs fulfill a broad range of vital educational purposes, including teacher training, English-language learning opportunities, and support for migratory children. Under the ESEA, the Department of Education must award formula grants to each State for each program, and the States must then pass down the vast majority of the funds to local educational agencies. Resource-starved local school districts rely heavily on these funds to serve their students, especially those who are from low-income backgrounds, are English learners, or are migratory.

2.      For states that have plans approved by the Department for administering ESEA's programs (as they all do), Congress left the Department no discretion regarding the amount of funds to provide to each state and when to provide those funds. Congress set forth mathematical formulas to determine the precise amount that the Department "shall allot" to each State for each program. The relevant appropriations statutes, in conjunction with the ESEA and the Impoundment Control Act, further require the Department to provide these formula funds to states in two tranches—the first on July 1 and the second on October 1—without room for delay in providing each tranche.

3.      For years, the Department has carried out these statutory mandates without incident. Congress has appropriated money each fiscal year for each program, and the Department has obligated the first tranche of formula funds to states on July 1. The Office of Management and Budget (OMB) has never stood in the way of this process, as it has always

1

complied with its legal duty to "apportion" the Formula Fund appropriations to the Department in advance of July 1.

4.      But history no longer repeats itself. On June 30, 2025, the Department alerted states that it would not be disbursing nearly $7 billion in ESEA funds that were required to be obligated to states on July 1. Instead, the Department adopted a new policy of "not . . . issuing Grant Award Notifications obligating funds for these programs on July 1 prior to completing [a] review" to ensure the funds "are spent in accordance with the President's priorities." The Department provided no legal authority or timetable for its review, nor did it indicate *what* it was reviewing given that the statutes leave no discretion in distributing the funds. OMB subsequently made clear that it is playing a role in this delay, stating that the funds were being withheld to prevent them from promoting a "left-wing agenda."

5.      Plaintiffs in this action are school districts, teachers, and nonprofit organizations directly impacted by Defendants' withholding of the formula funds. They do not want to spend their time suing the federal government; they want to do their jobs serving students and communities. Plaintiffs must bring this suit to seek urgent relief for the benefit of students and families across America. Without access to the ESEA funds, Plaintiffs will soon be forced to cut essential services, lay off staff, and abandon students who rely on this critical federal support.

## PARTIES

6.      Plaintiff Anchorage School District is Alaska's largest and most diverse school system, with approximately 3,108 educators and 1,942 support-staff serving more than 43,000 students in 94 schools encompassing nearly 2,000 square miles. It receives grants under ESEA Titles I-C, II-A, III-A, and IV-A.

7.     Plaintiff Cincinnati Public Schools, in Cincinnati, Ohio, is Greater Cincinnati's largest, and Ohio's second largest, school district. The school district has approximately 6,000 full-time educators and support-staff and serves more than 35,000 students in 60 schools across southwest Ohio. It receives grants under ESEA Titles II-A, III-A, and IV-A.

8.     Plaintiff Fairbanks North Star Borough School District is Alaska's second largest school district, with approximately 800 full-time educators and 700 support-staff serving more than 12,000 students in 33 schools spread encompassing nearly 7,361 square miles. It receives grants under ESEA Titles I-C, II-A, III-A, and IV-A.

9.     Plaintiff Kuspuk School District, located in remote Western Alaska, is one of the most geographically isolated and inaccessible public school systems in the nation. The district employs  over 130 professional educators and support staff who serve approximately 320 students across 9 schools spread over 12,000 square miles. Kuspuk receives grants under ESEA Titles I-C, II-A, IV-A, and has historically received funding under Title III-A.

10.     Plaintiff AFT Pennsylvania is a labor union representing more than 31,000 professional employees, including over 26,000 dues-paying members, in 64 local unions throughout the Commonwealth. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

11.     Plaintiff California Federation of Teachers is a labor union representing more than 120,000 education employees, including teachers and classified professionals, across California. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

12.     Plaintiff Illinois Federation of Teachers is a labor union representing more than 100,000 members in Illinois. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

13.     Plaintiff Florida Education Association is a labor union representing more than 120,000 educators and other educational professionals in Florida's public schools, colleges, and universities. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

14.     Plaintiff Florida PTA is the largest statewide volunteer-led child advocacy association working exclusively on behalf of children and youth. Founded in 1923 as a branch of the 3 million member National PTA, Florida PTA is made up of approximately 3 Regions, 14 Councils, and 1,450 local units with close to 200,000 Florida dues-paying members seeking to unite home, school, and community for all children. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

15.     Plaintiff New York State United Teachers is a labor union representing approximately 700,000 public and private sector professionals in schools, higher education, and health care institutions in New York. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

16.     Plaintiff Ohio Federation of Teachers is a labor union representing approximately 15,000 pre-k through 12 teachers and support staff in traditional public school and charter schools, higher education faculty and staff, library workers, and social workers across the state of Ohio. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

17.     Plaintiff P.S. 305 is a nonprofit educational advocacy organization working to improve Miami-Dade's K-12 public schools, which receive funding under ESEA Titles I-C, II-A, III-A, and IV-A

18.     Plaintiff Rhode Island Federation of Teachers and Health Professionals is a labor union representing approximately 10,000 members who work as teachers, nurses, and other health professionals, school related personnel, higher education faculty and staff, and state and

municipal employees. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

19.     Plaintiff Texas American Federation of Teachers is a labor union representing approximately 66,000 teachers and other employees of public school districts throughout Texas in matters related to their wages, hours, and terms and conditions of employment. Its members rely on funding under ESEA Titles I-C, II-A, III-A, and IV-A.

20.     Defendant Linda McMahon is the Secretary of the United States Department of Education. She is sued in her official capacity.

21.     Defendant United States Department of Education ("ED" or the "Department") is an Executive Agency of the United States, headquartered in Washington, D.C. ED is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

22.     Defendant Russell Vought is Director of the Office of Management and Budget ("OMB"). He is sued in his official capacity.

23.     Defendant OMB is a federal agency with responsibility for government-wide financial management policies for executive agencies and numerous financial management functions. *See* 31 U.S.C. §§ 503(a), 504. It is part of the Executive Office of the President, *id.* §501, and maintains a headquarters in Washington, D.C.

## JURISDICTION AND VENUE

24.     This court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1356(a)(2).

25.      This court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705, 706, and the court's inherent authority to enjoin federal officials from acting unlawfully.

26.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because Plaintiff Rhode Island Federation of Teachers and Health Professionals resides in this district.

## FACTUAL AND LEGAL BACKGROUND

### *Congress Enacts the ESEA and Subsequently Couples Funding with Accountability*

27.      The Elementary and Secondary Education Act (ESEA), signed into law on April 11, 1965, aims to combat poverty by strengthening and improving the quality of education in the Nation's elementary and secondary schools. *See* Pub. L. No. 89-10, 79 Stat. 27 (1965). The ESEA accomplishes its objectives by providing financial assistance from the Department of Education to state and local educational agencies, funneling the most funds to schools with the most economically disadvantaged students. In the lead-up to the ESEA's passage, President Lyndon B. Johnson described this funding as a "small price to pay … for developing our country's most priceless resource, our young people." The American Presidency Project, *Recorded Remarks on the Message on Education* (Jan. 12, 1965), https://perma.cc/T2MP-MVSX. "Every child," he declared, "must be encouraged to get as much education as he has the ability to take"—both "for [the child's] sake, and … for the country's sake." *Id.*

28.      Although the ESEA has changed over time, its critical goal of promoting the academic success of all children has received consistent support. Congress has reauthorized and amended the ESEA dozens of times since 1965. Most recently, in December 2015, with overwhelming bipartisan support, Congress reauthorized the ESEA through the Every Student Succeeds Act. Pub. L. No. 114-95, 129 Stat. 1802 (2015). Over the decades, Congress has

adopted more provisions providing particularized support for students facing specific challenges to academic success, such as language limitations or lack of access to quality instructional materials, and experimented with methods of measuring academic success. But through each of its iterations from 1965 until today, the primary focus of the ESEA has been providing all students, and especially those from low-income communities, with high-quality education that closes education gaps and prepares students for success. *See Every Student Succeeds Act (ESSA)*, U.S. Dep't of Educ., https://perma.cc/C8Q9-Z6QS; *see also* 20 U.S.C. § 6301.

29.     The Act's approach to closing achievement gaps is multi-faceted. Title I-A provides general financial assistance for local educational agencies (LEAs) that have a high concentration of children from low-income families. *See* 20 U.S.C. §§ 6311–6399. The ESEA's other grant programs disburse funds to schools with low-income students for more targeted purposes, from supporting after-school programming to recruiting and training high-quality teachers. To increase the effectiveness of its assistance programs, the ESEA encourages parental involvement in their children's education by, for instance, mandating that English language instruction programs create opportunities for parental engagement, *id.* § 6825(c)(3)(a), and even requiring that states consult with parents (and other community partners) when creating plans to carry out the purposes of the grants they receive, *id.* § 6611(d)(3). LEAs, too, must consult with stakeholders, such as parents, teachers, and administrators, in preparing plans they submit to the state describing how ESEA funds will be spent. *See* 20 U.S.C. § 6312; *id.* § 7918 (requiring consultation with tribal organizations "[t]o ensure timely and meaningful consultation on issues affecting American Indian and Alaska Native students"). And the ESEA supports not only public schools, but private schools, too, requiring that public schools receiving certain ESEA funds

provide equitable educational services to eligible private school children, teachers, or other personnel. *Id.* § 7881(a)(1), (c)(1).

30.    Over time, the ESEA has gradually incorporated increased accountability measures for schools receiving funds. Through a 1988 amendment, Congress required schools to demonstrate that their students were making academic progress and write improvement plans for students who failed to make progress. *Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988*, Pub. L. No. 100-297, 102 Stat. 130 (1988). Subsequent amendments increased emphasis on standardized testing and added math and reading standards. *See Improving America's Schools Act of 1994*, Pub. L. No. 103-382, 108 Stat. 3018 (1994). The ESEA's most well-known amendment, the No Child Left Behind Act, mandated increased standardized testing and imposed strict measures for schools that failed to meet specific indicators of student success. Pub. L. No. 107-110, 115 Stat. 1425 (2002). That Act also introduced "challenging State academic standards"—objective benchmarks that states were to use to measure academic achievement in reading, math, and science. *Id.* § 1111(b); *see also* 20 U.S.C. § 6311.

31.    Eventually, after mounting criticisms that the No Child Left Behind Act was too punitive and involved the federal government too significantly in local education policy, Congress enacted the most recent amendment to the ESEA: the Every Student Succeeds Act. Pub. L. No. 114-95 (2015). That Act retained similar accountability measures as those adopted by the No Child Left Behind Act, but granted states more flexibility in implementing them. For instance, while schools must still use standardized testing to measure academic achievement, testing is no longer the only measure of success, and states have latitude to consider factors such as chronic absenteeism, career readiness, and completion of advanced coursework. *Id.* § 4203.

And states still must adopt "challenging State academic standards," but they maintain greater discretion in setting those standards. *Id.* § 1111(b).

32.    Even with these developing accountability standards, Congress has consistently protected local control over "instructional content, curriculum, and related activities." 20 U.S.C. §§ 7907(c), (d). The ESEA prohibits the "Secretary or any other officer or employee of the Federal Government" from "mandat[ing], directi[ng], or control[ing]" "instructional content or materials, curriculum, program of instruction, academic standards, or academic assessment." *Id.* § 6692(a)(1).

33.    The majority of schools nationwide benefit from ESEA funds and specifically from the ESEA grant programs at issue here, in Titles I-C, II-A, III-A, and IV-A. Each of these programs allows schools to offer tailored support to help students achieve academic success.

34.    **Title I-C** (20 U.S.C. §§ 6391-6399). With Title I-C funds, schools are better able to provide "high-quality and comprehensive educational programs" to migratory children, defined as children who, because of economic necessity, have moved school districts during the preceding 3 years because of a family member's job "as a migratory agricultural worker or a migratory fisher." 20 U.S.C. § 6399. Those jobs are often temporary in nature and may involve multiple moves throughout a fishing or farming season. The Title I-C program "address[es] the unique educational needs of migratory children" to ensure they are able to "overcome educational disruption" caused by inter-district moves and "receive full and appropriate opportunities to meet the same challenging State academic standards that all children are expected to meet." *Id.* § 6391.

35.    **Title II-A** (20 U.S.C. §§ 6611–6614). Title II-A funds support the recruitment, retention, and development of high-quality teachers, principals, and other school leaders to

9

"increase student achievement" and "provide low-income and minority students greater access to effective" school leaders. 20 U.S.C. § 6601. Grants under this section specifically support state and local projects that, for example, reform teacher and principal certificate programs, support new teachers, provide professional development opportunities, and reduce class sizes. *Id.* §§ 6611(c), 6613.

36.    **Title III-A** (20 U.S.C. §§ 6811–6874). Schools use Title III-A grants to improve language instruction for English learners and immigrant students. In particular, the Title III-A program seeks to ensure that these students receive adequate English instruction so that they "can meet the same academic challenging State academic standards that all children are expected to meet," and to promote family participation in language instruction. *Id.* §§ 6812, 6821, 6825.

37.    **Titles IV-A** (20 U.S.C. §§ 7101–7165) (part of the "21st Century Schools" program) aims to increase the capacity of schools nationwide to provide students with a "well-rounded education," "improve school conditions for student learning," and use technology to "improve the academic achievement and digital literacy of all students." 20 U.S.C. § 7111. States and local educational agencies may engage in a wide range of activities to these three ends. For instance:

     a.    Activities that support well-rounded educational opportunities include providing college and career counseling; using art and music to promote problem solving and conflict resolution; improving instruction in science, technology, engineering, and mathematics ("STEM subjects"), such as by increasing access to STEM subjects for females, children with disabilities, minority students, and others who are normally underrepresented in STEM careers; providing accelerated learning programs including college high school

courses; strengthening programs to teach traditional American history; offering foreign language instruction and environmental education; promoting volunteerism; and other activities that support a well-rounded education experience. *Id.* § 7117.

b.   Activities that support safe and healthy students may include programs for drug and violence prevention, mental and physical health, suicide and sexual abuse prevention, and supporting positive behaviors to improve academic outcomes. *Id.* § 7118(5).

c.   And activities that support the effective use of technology are those that provide educators with the tools and professional development opportunities necessary to effectively use technology in the classroom, personalize learning to improve student academic achievement, and provide students in rural and other underserved areas with resources to take advantage of digital resources and access to online courses. *Id.* § 7119.

38.   As described further below, each of the relevant titles prescribes formula grant programs (the "Formula Grant Programs") mandating that the Secretary of Education "shall allot" funds to each State as determined by statutory formulas based on variables specific to each program and its purpose (the "Formula Funds"). Under each Formula Grant Program, the States then obligate and disburse Formula Funds to local jurisdictions or, in some cases, organizations, pursuant to subgrants.

***Each State Has an Approved Consolidated State Plan and is Eligible for Funding***

39.   In order to receive its appropriated allotment of Formula Funds under the ESEA Title I-C, II-A, III-A, or IV-A, states must submit a plan to the Secretary of Education detailing

how the state will use the funds. *See* 20 U.S.C. §§ 6396, 6611(d), 6823, 7113(c), 7173. The plans must include assurances that the funds will be used for the purposes of the statutory programs.

40.    These state plans are time-intensive. For example, to prepare a plan for grants under Title II-A the SEA must "meaningfully consult with teachers, principals, other school leaders, paraprofessionals (including organizations representing such individuals), specialized instructional support personnel, charter school leaders (in a State that has charter schools), parents, community partners, and other organizations or partners with relevant and demonstrated expertise in programs and activities" concerning how to best address the purposes of the grants, 20 U.S.C. § 6611(d)(3), and must coordinate with similar activities across the state. *Id.*

41.    To simplify the process, Congress created a mechanism to permit SEAs to submit a single consolidated plan covering each of the Formula Grant Programs, along with several other programs under the ESEA. 20 U.S.C. §§ 7842 (permitting consolidated plans for "covered programs"), 7801(11) (defining "covered program" to include "each of the programs authorized by" Parts I-A, I-C, I-D, II-A, III-A, IV-A, IV-B, and V-B(2) of the ESEA).

42.    In addition to helping to streamline the process for submission and review of state plans, the consolidated plan underscores the ways in which ESEA programs are interconnected and, ultimately, reliant on one another.

43.    For example, to be eligible for funds under Title I-A—the largest EASA program —state plans must include information concerning the states' adoption of challenging academic standards; academic assessments; and state accountability systems. *See* 20 U.S.C. § 6311.

44.    These standards, assessments, and accountability systems, in turn, ultimately depend on the success of the grant programs for which Congress has appropriated funds. For example, states are held accountable for and must track and assess English proficiency of all

English learners. *Id.* at § 6311(b). The funds that Congress appropriated for Title III-A's English Language Acquisition program are intended to help states meet those English proficiency standards. Without them, states are left without a critical resource to meet the standards required by statute.

45.     The Department must review and approve each state plan; only after notice and an opportunity to amend and be heard can the Secretary disapprove the plan. 20 U.S.C. § 7871. In reviewing plans, the Secretary has little discretion. Indeed, the statute prohibits disapproving a state plan based on the "nature of the activities proposed . . . if such proposed activities meet the applicable program requirements." *Id.* at § 7871(c).

46.     On March 13, 2017, ED issued an amended template for SEAs to use to submit consolidated plans under this provision. Revised State Template for Consolidated Plan, U.S. Dep't of Educ. (Mar. 2017), *available at* https://perma.cc/9P3J-QMQR (2017 Template).

47.     By September 2018, the SEAs for each of the fifty states, the District of Columbia, and Puerto Rico submitted a consolidated plan that was approved by the Department of Education. *See* NCSL, *Every Student Succeeds Act: Information and Resources* (Sep. 26, 2018), https://perma.cc/E4ST-VLU6.

48.     As SEAs have made changes to their programs, they have submitted amended plans that have also been reviewed and approved by the Department.

49.     When SEAs submit amended plans, previously approved plans remain in place until and unless those amendments are approved. *See* 34 C.F.R. § 76.103 (allowing for state plans to be effective for multiple years). As such, since consolidated plans were first approved in 2017 and 2018, every SEA has consistently had an operable approved plan.

50.     If an SEA has an approved plan, either under each program individually or, as is the case with each SEA today, through the ESEA's consolidated plan provision, the Department is required to make funds available under each of the Formula Grant Programs.

51.     Congress created a similar structure at the state level, requiring that LEAs submit to states plans for the use of Title funds and providing for LEAs to submit a single, consolidated plan. *See* 20 U.S.C. § 7845. Like state plans, this requires significant consultations and work for each LEA; where applicable, this includes consultations with local tribes. *See Id.* § 7918.

52.     Congress created an exclusive, formal mechanism for the Department to enforce the conditions attached to grants generally, including those under the Formula Grant Programs. *See* 20 U.S.C. §§ 1234-1234i. Under this process, which anticipates withholding from specific recipients, not from a program writ large, the Department can withhold further payments, in whole or in part, only after providing notice and an opportunity for hearing. 20 U.S.C. § 1234d(b), (d). The withholding cannot be effected until after appeal from an administrative law judge to the Secretary, and after judicial review in the appropriate federal court of appeals. *Id.* §§ 1234d (c), (f); 1234g. Congress has not provided any other authority for the Department to withhold payments due under an approved State plan.

***Congress Has Continued to Fund ESEA Formula Grant Programs, Including for FY25***

53.     Since enacting ESEA in 1965, Congress has consistently appropriated funds for Formula Grant Programs. In 2024, Congress appropriated billions of dollars to the Department of Education for these programs. *See* Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, div. D, tit. III, 138 Stat. 460, 681-93 (2024).

54.     For example, Congress appropriated $19,107,790,000 for the education of disadvantaged children, including among other things, "carrying out title I" of ESEA, for

14

academic year 2024-2025. *Id.* at 682. As noted above, Title I of ESEA mandates several formula grant programs, including (in Title I-C) programs for the education of migratory children. *See* 20 U.S.C. §§ 6391-99.

55.    The 2024 Appropriations Act likewise appropriated funds for each of the other Formula Grant Programs referenced above. Specifically, Congress appropriated:

     a.    $5,776,178,000 for carrying out, among other programs, "school improvement activities authorized by . . . part A of title II" of ESEA (professional development for teachers) for academic year 2024-2025 (138 Stat. at 682);

     b.    $890,000,000 "[f]or carrying out part A of title III of the ESEA" (English Language Acquisition) (*id.* at 684);

     c.    $1,380,000,000 "for grants under subpart 1 of part A of title IV" (academic enrichment and student support) for academic year 2024-2025 (*id.* at 683).

56.    For each of these appropriations, Congress specified that the funds (or some portion of them) "shall become available on July 1, 2024." *Id.* at 682. For example, Congress provided that of the $19 billion appropriated for the education of disadvantaged children under Title I, $8 billion "shall become available on July 1, 2024" and "shall remain available through September 30, 2025." *Id.*; *see also id.* (specifying that $3,947,312,000 for school improvement programs under Titles II-A, IV-A-1, and IV-B, and other programs, "shall become available on July 1, 2024); *id.* at 684 (English language acquisition funds under Title III "shall become available on July 1, 2024").

57.    On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds referenced above, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.

No. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (2025) (the "2025 Continuing Resolution"). Thus, Congress re-appropriated the same amounts to each of the Formula Grant Programs referenced above and provided that the same sums "shall become available" on July 1, 2025 that became available on July 1, 2024.

58.     As reflected in the table below, since at least 2017, congressional funding for these grant programs has remained relatively stable (or increased), allowing states and localities to rely on such funding in planning for the upcoming school year.

**ESEA Appropriations, FY 2017-FY2024**
(Dollars in thousands)

| Program | ESEA Title | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 & FY 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Migrant education | I-C | $374,751 | $374,751 | $374,751 | $374,751 | $375,626 | $375,626 | $375,626 | $375,626 |
| Teacher development | II-A | $2,055,830 | $2,055,830 | $2,055,830 | $2,131,830 | $2,143,080 | $2,170,080 | $2,190,080 | $2,190,080 |
| English Language Acquisition | III-A | $737,400 | $737,400 | $737,400 | $787,400 | $797,400 | $831,400 | $890,000 | $890,000 |
| Academic enrichment and student support | IV-A | $400,000 | $1,100,000 | $1,170,000 | $1,210,000 | $1,220,000 | $1,280,000 | $1,380,000 | $1,380,000 |

*See* Rebecca R. Skinner, Cong. Research Serv., R45977, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer* 25-27 (Table 1) (2024); U.S. Dep't of Educ., Budget Tables, https://perma.cc/3PN7-8GYE.

59.     Congress has also specified how the Secretary must allot the appropriated funds to the states, and how the states must then provide the funds to LEAs.

60.     For each of the Formula Grant Programs, the ESEA specifies that the Secretary "shall" use the appropriated funds to allot funds and make grants to the states. Specifically:

16

a.    For Title I-C funds (education of migratory children), Congress directed that the Secretary "shall make grants to State educational agencies . . . to establish or improve, directly or through local operating agencies, programs for education for migratory children." 20 U.S.C. § 6392. The statute then sets forth a formula specifying the amount that each state "is entitled to receive," based in part on each state's number of migratory children and youth ages 3-21. *Id.* § 6393(a); Skinner, *supra*, at 9.

b.    For Title II-A funds (teacher professional development), Congress has directed that "the Secretary shall allot funds" to each state based on student population and poverty counts. 20 U.S.C. § 6611(b)(3); *id.* § 6611(b)(2)(A)(iv); *see also* Skinner, *supra*, at 10-11.

c.    For Title III-A funds (English language acquisition), Congress directed that, "in the case of each State educational agency having a plan approved by the Secretary," the Secretary "shall make a grant" and "shall allot" to state educational agencies (SEAs) an amount based on the proportion of English learners and immigrant students in each state relative to all states. 20 U.S.C. § 6821(a), (c); Skinner, *supra*, at 13.

d.    For Title IV-A funds (academic enrichment and student support), Congress directed that the Secretary "shall allot to each state" funds based on their Title I-A funding from the prior year. 20 U.S.C. § 7113(b); Skinner, *supra*, at 14.

61.    Congress has likewise delineated how amounts appropriated for these programs should be provided to LEAs. In most cases, funds are passed down to LEAs from the states according to a statutory formula. Specifically:

17

a.   For the Title II-A program, Congress provided that states "shall" use at least 95% of their allotments "to make subgrants to local educational agencies" based on a statutory allocation formula. 20 U.S.C. §§ 6611(c)(1), 6612.

b.   For the Title III-A program, states must "expend at least" 95% of their allotment "to award subgrants" to award subgrants to Local Education Agencies based on a statutory allocation formula. 20 U.S.C. §§ 6821, 6824, 6825, 7011(3).

c.   For the Title IV-A program, states "shall allocate to each local educational agency in the State that has an application approved by the State educational agency" an amount based on a statutory allocation formula. 20 U.S.C. § 711(a)(5).

***Congress Forward-Funds Appropriations for ESEA Grants to Allow for Timely Awards to States***

62.    Recognizing that federal fiscal and school years do not overlap neatly, Congress does not follow its traditional funding process for the Formula Grant Programs. Congress appropriates funds for the Formula Grant Programs one fiscal year in advance and makes a significant portion of those funds "available on July 1," ahead of the federal fiscal year beginning on October 1. *Supra* at 15-16; *See* 20 U.S.C. § 1223 (allowing for appropriations a year in advance); *id.* § 1225(a) (allowing the Secretary of Education to make funds available not on a fiscal year basis).

63.    This funding process (known as "forward funding") provides "additional time for school officials to develop budgets in advance of the beginning of the school year and to better align federal appropriations with the fiscal year used by many LEAs, which runs from July 1 to June 30." Rebecca R. Skinner and Isobel Sorenson, Cong. Rsch. Serv., R48165, *The Elementary*

18

*and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): An Analytical Review of the Allocation Formulas*, 70 (2004) (citing Gov't Accountability Office, *A Glossary of Terms Used in the Federal Budget Process*, GAO-050-734SP, at 56 (Sept. 2005)). *See also* 20 U.S.C. § 1223 (permitting forward funding to "afford[] the responsible Federal, State, and local officers adequate notice of available Federal financial assistance….").

64.    Making funds available on July 1 allows the Department of Education to release funds to SEAs in time for the SEAs, in turn, to release funds to LEAs and other subgrantees to make  obligations over the summer and in preparation for the new school year.

65.    Recognizing this need, the Department has consistently released funds under the Formula Grant Programs on or around July 1 and it has structured its own processes around this date.

66.    The Department of Education has also consistently reiterated its policy to provide funding in a timely manner on or around July 1. For example, a 2017 template released for states to submit consolidated plans reminds SEAs that they will need to submit necessary assurances "[i]n order to receive fiscal year (FY) 2017 ESEA funds on July 1, 2017, for the programs that may be included in a consolidated State plan." Revised State Template for Consolidated Plan, U.S. Dep't of Educ. (Mar. 2017), *available at*  https://perma.cc/9P3J-QMQR (2017 Template).

67.    In seeking information from SEAs to evaluate the SEAs' timely distribution of funds to grantees under Title III, the Department notes that its distribution to states is "normally on July 1 of each year for the upcoming school year." *See, e.g.* Ohio Consolidated State Performance Report Part 1 2021-2022 at 46 (June 16, 2023), https://perma.cc/7S54-M6RZ.

68.    Similarly, a January 2025 guidance document issued by the Department on Title II-A of the ESEA explains that the Department "makes funds available as close to [July 1] as

possible." U.S. Dept. of Education, Title II, Part A of the Elementary and Secondary Education Act of 1965: Supporting Effective Instruction State Grants (Jan. 2025) at 13, https://perma.cc/62Y6-JRJG. And a similar document published in FY23 on Title IV-B of the ESEA states that funds "are available for obligation by an SEA for a total of 27 months (e.g. Federal fiscal year 2023 funds are available from July 1, 2023 through September 30, 2025) . . . ." U.S. Dep't of Educ., Nita M. Lowey 21st Century Community Learning Centers Program Title IV, Part B of the Elementary and Secondary Education Act of 1965, Non-Regulatory Guidance 9 (Jan. 2024), https://perma.cc/JY3T-UT8P.

69.     Moreover, to help ensure that SEAs are prepared to make funds available to LEAs, the Department provides states with draft allocations in the spring, usually within two months after Congress finalizes appropriations for the relevant fiscal year.

***OMB Must Apportion the Formula Funds to the Department***

70.     Under the Anti-Deficiency Act, OMB (acting pursuant to a delegation from the President) must "apportion" appropriated funds to the agency to which Congress appropriated the funds. 31 U.S.C. § 1512(a). The purpose of the apportionment process is to prevent agencies from spending appropriations too quickly, such that they would run out of money during the fiscal year and need to request a "supplemental appropriation" from Congress. *Id.*

71.     As relevant here, OMB must apportion all appropriations to agencies not later than "30 days after the date of enactment of the law by which the appropriation is made available." *Id.* § 1513(b)(2)(B). The 2025 Continuing Resolution that appropriated the relevant Formula Funds was enacted on March 15, 2025, meaning OMB was required to apportion the Formula Funds to the Department by April 14, 2025.

72.     The Anti-Deficiency Act provides that OMB may hold back appropriations from its apportionments, so as to establish a "reserve," only (A) to provide for contingencies; (B) to

achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (c) as specifically provided by law." *Id.* § 1513(c). Prior to 1974, the Anti-Deficiency Act had an additional provision allowing broader grounds for establishing reserves, but Congress repealed that provision to "preclude the President from relying on the Act as authority for implementing policy impoundments." City of New Haven v. United States, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987).

73.    Prior to this year, OMB has apportioned the full amount of ESEA "forward funding" that becomes available on July 1 prior to that date. *See, e.g.*, *School Improvement Programs*, OpenOMB, https://perma.cc/Q3WD-TZMF (showing that, on April 19, 2024, OMB apportioned the full amount appropriated for "School Improvement Programs" in 2024 that became available on July 1, 2024.

74.    OMB apportionments in years prior are known because, in 2022 and 2023, Congress enacted laws requiring OMB to post its apportionments online, to provide transparency in light of incidents of manipulation of the apportionment process to impound funds. Pub. L. No. 117-103, div. E, tit. II, §§ 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note) ; Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note).

75.    However, on March 29, 2025, just two weeks before OMB would have had to post its apportionments from the 2025 Continuing Resolution, OMB Director Vought announced that OMB "will no longer operate and maintain" the website mandated by law. Litigation over that decision is pending, but as of today, OMB continues to not post its apportionments as required by law. Consequently, the public is not able to view whether OMB apportioned the Formula Funds to the Department by the April 14 deadline, or at least prior to July 1.

*Defendants Withhold Billions of Dollars in ESEA Formula Funds to States*

76.     Throughout the Spring of 2025, Defendants were noticeably silent regarding the amount states could expect under the Formula Grant Programs.

77.     On information and belief, the Department submitted proposed allocations regarding the Formula Grant Programs for the 2025-2026 school year to OMB.

78.     On information and belief, OMB refused to approve the proposed allocations, and has refused to apportion the relevant appropriations to the Department.

79.     On June 30, 2025, the Department notified the states and Congress that the Department had adopted a policy under which it would not issue on July 1 the Grant Award Notifications for the Formula Grant Programs, or the allotments to each State of the Formula Funds, as necessary to obligate and release the billions of dollars of Formula Funds appropriated for the 2025-2026 school year, until after a review to ensure the funds are spent in alignment with the President's policy priorities. Mark Lieberman, *Trump Tells States He's Holding Back $6.8 Billion for Schools*, EducationWeek (June 30, 2025), https://perma.cc/A9KH-NVY2.

80.     In an unsigned email sent to SEAs from noreply@ed.gov, the Department stated that:

> Given the change in Administrations, the Department is reviewing the FY 2025 funding for the [Title I-C, II-A, III-A, IV-A, IV-B] grant program(s), and decisions have not yet been made concerning submissions and awards for this upcoming academic year. Accordingly, the Department will not be issuing Grant Award Notifications obligating funds for these programs on July 1 prior to completing that review. The Department remains committed to ensuring taxpayer resources are spent in accordance with the President's priorities and the Department's statutory responsibilities.

81.     The Department sent a similar email to congressional staff.

82.     Notably, the Department has provided no timeline regarding when, or if, the funds will be released, except that Administration officials indicated on July 18 that Title IV-B funds will be released on July 21.

83.     When asked by the press about the withheld funds in the days following the announcement, a Department spokesperson referred those questions to OMB. Susan Crabtree, *OMB: States Used Education Grants for 'Left Wing Agenda'*, Real Clear Politics (July 5, 2025), https://perma.cc/4KS2-A296.

84.     OMB in turn claimed that "[i]nitial findings show that many of these grants programs have been grossly misused to subsidize a radical left-wing agenda." *Id.* The spokesperson further alleged that in prior years English-learning funds have been used to promote "illegal immigrant advocacy organizations" and to direct undocumented immigrants towards "scholarships intended for American students," while school improvement funds have been used to conduct a seminar on "queer resistance in the arts." *Id.*

85.     On July 17, OMB Director Vought said at a *Christian Science Monitor* breakfast that Defendants were considering sending a second 2025 rescission proposal to Congress pursuant to the Impoundment Control Act to claw back additional funds that Congress had appropriated. Brett Samuels, *White House likely to send another rescissions package to Congress*, The Hill (July 17, 2025), https://perma.cc/B646-36XD.

86.     On July 18, 2025, Senator Shelly Moore Capito (R-W.Va) announced in a post on X (formerly Twitter) that the OMB Director told her that the Department of Education "is releasing crucial funds to states that support after school and summer education programs." Shelley Moore Capito (@SenCapito), X/Twitter (July 18, 2025, 11:31 AM EST), https://perma.cc/4Z9K-DFLN. Adding that this in "direct response" to a letter she organized that

urged the release of the withheld funds, signed by nine other Republican Senators. Press Release, *Following Capito-led Efforts, Education Department Releases Critical Funds*, Shelley Moore Capito (July 18, 2025), https://perma.cc/REL6-4DRS; Letter from Senators to Russell Vought, Dir. of the Off. of Mgmt. and Budget (July 16, 2025), https://perma.cc/AA2N-JTQ6. Similarly, Senator Katie Britt stated that the release was a response to the letter and that "[she] appreciate[d] President Trump and OMB (Office of Management and Budget) Director Vought responding to our request to ensure our local communities can continue to serve students and families." Trisha Powell Crain, *Britt: Federal funds for Alabama summer learning programs to be released*, Ala. Daily News (July 18, 2025), https://perma.cc/E6PQ-9UWH.

87.    Very shortly after it was announced on social media, an email was sent to 21st Century Community Learning Centers recipients from the Department of Education, stating that "On Monday, July 21, 2025, the U.S. Department of Education will release $1.3 billion in 21st Century Community Learning Centers (21st CCLC) funding for the current federal and education fiscal year." Letter from La' Shawndra Scroggins, to 21STCCLC@LISTSERV.ED.GOV (July 18, 2025), https://perma.cc/UMH8-PVYM. The email stated that the Grant Award Notifications ("GAN") will include additional "condition[s] to ensure compliance with applicable laws and regulations." The email also noted that "Decisions as to other funds referenced in the June 30 notice have not been made at this time."

### Plaintiff School Districts are Harmed by the Department's Failure to Make Billions of Dollars in Appropriated Funds Available as Required

88.    Each of the school district Plaintiffs, including their teachers and the students they serve, is significantly harmed by the Department's withholding of the Formula Grants.

89.    The school district Plaintiffs have planned for the upcoming school year in reliance on the withheld funds becoming available on or around July 1. The fiscal year for each

of the Plaintiff school districts—Anchorage School District, Cincinnati Public Schools, Fairbanks North Star Borough School District, and Kuspuk School District—runs from July 1 to June 30. Normally, then, these school districts would have their budgets fully approved by their state departments of education and would be incurring expenses under the Formula Grant Programs to adequately prepare in advance of the school year. With the start of the school year around the corner (as early as August 20 for Cincinnati Public Schools), school districts must now begin finalizing and purchasing materials for teacher training, classroom curriculum, and other activities. But because of the withholding of funds for these Formula Grant Programs, school districts have had to cancel orders for new curriculum, delay critical teacher training, pause contracts for services for English language learners, or take other actions to avoid incurring expenses that they cannot afford to pay without the money normally provided by the Formula Grant Programs. School districts are also reevaluating their budgets and weighing cuts to staff that are necessary to provide programs that support the academic achievement of students most in need.

90.    Additionally, the school district Plaintiffs are experiencing harms specific to each of the Formula Grant Programs for which they normally receive funds on or around July 1.

### *Title I-C (Education of Migratory Children)*

91.    The Anchorage School District expected to receive approximately $6 million in Title I-C funds. These funds supported the salaries of around 50 employees who recruited and supported the instruction of migratory students. The withholding of these funds will immediately impair the district's ability to deliver statutorily authorized services for this population.

92.    The Fairbanks North Star Borough School District expected to receive approximately $1.23 million in Title I-C funds. These funds cover the salaries of 16 school–term

tutors, comprehensive out-of-school hour tutoring, robust professional development in paraprofessional, literacy, and family engagement strategies for Migrant Education staff, summer learning enrichment programs, preschool support, and essential transportation support. Students in foster care and/or experiencing homelessness are highly likely to be supported by programs including the Migrant Education Program that uses Title I-C funds. The loss of Title I-C funds may force the school district to lay off tutor positions, which would leave students in need of this support without it for an entire school year.

93.    The Kuspuk School District received $39,639 in Title I-C funds for the last school year, and expected to receive such funds for the upcoming school year. These funds support migratory students and their families through services such as summer learning, home-based instructional materials, and academic supplies. The funds also support access to district-sponsored summer learning programs such as Spirit Camp, the George River Internship, Math Science Expedition, and Caunaq Summer Camp. For the upcoming school year, the district anticipated that every migrant student would receive at least five books to build their home library, a full set of school supplies for the year, and essential outdoor gear to ensure all students could participate in outdoor summer learning opportunities.

### Title II-A (Teacher Professional Development)

94.    The Anchorage School District expected to receive approximately $3.3 million in Title II-A funds. These funds supported, among other things, the salaries of teacher experts who supported multiple schools in Anchorage. The withholding of Title II-A funds has forced the district to reassign staff in "teacher expert" support positions and cancel preservice trainings for paraprofessional educators that provide classroom support, onboard and train new teachers, and deliver science of reading-based literacy development. Many serve as instructional coaches,

ensuring educators provide effective reading and math instruction through the delivery of rigorous core instructional access to all students. These support positions provide expertise by training, modeling, coaching, and facilitating inquiry processes to meet wide-ranging student needs, whether students require intervention, targeted support strategies, enrichment, or acceleration for optimal growth.

95.    Cincinnati Public Schools expected to receive approximately $2.3 million in Title II-A funds. These funds cover portions of the salaries for instructional coaches, who have access to and are trained to use high-quality, standards-based curriculum materials in math, science, English language arts, and social studies. The funds also allow Cincinnati Public Schools to provide robust training designed to equip teachers to provide instruction that satisfies the State of Ohio's educational standards and to meet the particularized needs of students regardless of social-economic background. The school district is anticipating delaying, scaling back, or eliminating portions of training if it does not receive funds, and facing the possibility of having to eliminate positions for instructional coaches or other specialists.

96.    The Fairbanks North Star Borough School District expected to receive approximately $900,000 in Title II-A funds. The school district intended to use the funds to cover the salaries of five full-time instructional coaches who train teachers who are new to the profession or teach at schools identified for improvement. In the past, this training has been key to recruiting and retaining highly effective teachers. These funds also allow the school district to retain a team of instructors that provides specialized feedback on curriculum and instruction for students with disabilities, not only for public schools within the district but also for two local private schools that consult with the team. Without Title II-A funds, the school district will not

be able to implement plans to support teachers with supplemental training and skill development, including through the use of instructional coaches.

97.    The Kuspuk School District received $61,673 in Title II-A funds for the last school year, and expected to receive such funds for the upcoming school year. These funds allow Kuspuk to deliver teacher training aligned with local priorities, including culturally responsive instruction, instructional coaching, and leadership development. The funds also support retention and recruitment strategies that have been negotiated into the district's collective bargaining agreements. For example, for the upcoming school year, Kuspuk projected that approximately 60% of certified educators would be eligible to receive a longevity bonus as a retention incentive using these funds. Staff also expected to be able to use these funds for tuition reimbursement for higher education, helping them pursue advanced degrees.

### *Title III-A (English Language Acquisition)*

98.    The Anchorage School District expected to receive approximately $550,000 in Title III-A funds. These funds supported seven staff positions focused on increasing English language acquisition, attendance, credit recovery and graduation for English learners. The withholding of Title III-A funds puts these staff positions—and therefore the quality of education services to English language learners—at risk.

99.    Cincinnati Public Schools expected to receive approximately $660,000 in Title III-A funds. These funds are critical to allow the school district to provide Title III-A programming and serve more than 2,000 English language learner students. With the funds, Cincinnati Public Schools operates "welcome centers," which assist newly-enrolled students from non-English-speaking households enroll in appropriate courses and provide other social services (including computer classes) that have a positive effect on graduation rates. Cincinnati

Public Schools also relies on these funds to pay for a contract for translation services to help multilingual families with enrollment, orientation, and other education-related meetings. Additionally, the district was set to roll out the use of an online platform that tracks the language skills of English language learners and helps schools in the district measure language acquisition progress. After the June 30 announcement that Title III-A funds were being withheld, Cincinnati Public Schools had no choice but to put a hold on its use of Elevation and pause its contract for translation services. Cincinnati Public Schools may also have to cut staff positions for enrollment centers and therefore scale back these critical services to newly enrolled students from non-English-speaking families.

100.    Fairbanks North Star Borough School District expected to receive approximately $25,800 in Title III-A funds. With these funds, the school district would be able to facilitate opportunities for parent and family engagement in children's education, provide professional development for teachers of English language learners, and purchase supplemental language instruction educational programs, among other things. Without Title III-A funds, some of these services will be scaled back or eliminated, to the detriment of our students' education.

101.    The Kuspuk School District received $17,732 in Title III-A funds for the last school year, and expected to receive such funds for the upcoming school year. These funds support the ongoing implementation of the Sheltered Instruction Observation Protocol (SIOP) model, which is designed to make academic content accessible to English Learners while promoting language development. Because English is not the first language for more than 60% of the district's teaching staff, sustained SIOP training has been critical to ensuring educators can effectively support English Learners across subjects and grade levels.

### *Title IV-A (Academic Enrichment and Student Support)*

102.     The Anchorage School District expected to receive approximately $2 million in Title IV-A funds. These funds supported, among other things, professional development of staff in world language programs, high school counseling staff, professional development on positive behavior intervention systems, and professional development on using technology to enhance instructional practices. The district has already been compelled to cancel educator training sessions traditionally held in July and August. These trainings are critical for preparing teachers to meet the academic and social needs of students at the outset of the school year. Their cancellation directly impairs the district's ability to deliver a high-quality learning environment for all students. Furthermore, the district has already had to initiate the formal layoff and reassignment processes for numerous employees whose roles were funded through the affected grants. These staff members play key roles in supporting student learning, instructional delivery, and school operations. Their loss further diminishes the district's capacity to meet its educational mission and comply with both state and federal expectations.

103.     Cincinnati Public Schools expected to receive approximately $2.25 million in Title IV-A funds. These funds support Title IV-A programming for Advanced Placement courses within its schools, expand programming for the International Baccalaureate programming, Montessori schools, and social emotional and world languages curriculum. These funds also support STEM programming and the effective use of technology. Without the Title IV-A funds, Cincinnati Public Schools will be forced to scale back or eliminate some of the services offered through these programs. The school district also has had to cancel planned purchases of new curriculum with these funds, meaning that students will have to rely on outdated curriculum.

104.    Fairbanks North Star Borough School District expected to receive approximately $418,000 in Title IV-A funds. These funds would cover the salaries of 3.5 full time social services managers—one of whom is dedicated to ensuring that students who have been involved in the criminal justice system can transition well from the youth detention facility into school. The funds also support a training and support program that aims to implement structures and leadership opportunities into recess time that support positive social interactions between students.

105.    The Kuspuk School District received $61,363 in Title IV-A funds in the last school year, and expected to receive such funds in the upcoming school year. For this school year, Kupsuk anticipated that such funds would be used to support the district's emergency communication platform, which allows schools to send alerts and parent notifications quickly. This is an essential service in Kuspuk's remote communities where communication barriers can be a challenge and the district must ensure that multiple communication methods are available, since many villages lack consistent cellular data or Wi-Fi.

***The Teachers Union Plaintiffs and Their Members are Harmed by the Department's Failure to Make Billions of Dollars in Appropriated Funds Available as Required***

106.    The Teachers Union Plaintiffs and their members are also harmed by the withholding of Formula Funds. The Teachers Unions' members include teachers, tutors, instructional coaches, and other educational staff whose salaries are funded in full or in part with funds provided by the Formula Grant Programs. Many of the Teachers Unions' members are therefore facing the immediate and unexpected prospect of losing their jobs.

107.    Additionally, the Teachers Unions' members receive training and other support that is funded in whole or in part by money provided under the Formula Grant Programs. Even if teachers and other instructional staff retain their positions, they may lack access to the support

they need to effectively instruct all students—especially those who have particularized needs, such as migratory students or English language learners.

108.    Cuts to staff positions normally funded by the Formula Grants will also result in larger class sizes, which will make it more difficult for teachers to effectively perform their jobs and may make it more difficult for certain school districts to retain teachers because of the negative impacts on their teaching experience.

109.    The uncertainty surrounding if or when the Formula Funds will be released is causing significant anxiety and confusion among the Teachers Unions' members right before the start of the school year. The Teachers Unions are under intense stress and pressure to help members determine exactly how their jobs will be affected. Some members will be scrambling to find new jobs.

110.    The Teachers Unions will also be harmed by receiving less dues. Dues are deducted out of members' monthly paychecks, and therefore layoffs will directly affect how much the unions collect in dues. The Teachers Unions will also have less bargaining power with fewer members.

111.    The students taught by the Teachers Unions' members will suffer inevitable follow-on harms from the loss of staff and professional support for staff. They will not have the same opportunities to receive high quality instruction from teachers who are equipped with the best, science-based methods for teaching students with particularized needs, and they will have fewer opportunities to participate in the full range of educational programs designed to help them achieve.

***The Florida PTA and P.S. 305 and Their Members Are Harmed by the Withholding of Funds***

112.    Plaintiff Florida PTA is also harmed by the withholding of Formula Funds. Florida PTA's mission is to promote the welfare of children and youth in homes, schools, places

of worship, and communities by providing resources, educational programming, and support systems aimed at strengthening families and ensuring safe, healthy environments. Its local units across the state further that mission by hosting back-to-school events, planning family engagement events, promoting student safety initiatives, and providing enrichment opportunities for children. The withholding of funds disrupts Florida PTA's normal work and forces it to divert its resources. It will not be able to offer the family and community programming that it typically would, and instead will be forced to divert its resources to fill in gaps in services to families and students.

113.    Florida PTA's members will also be harmed. Florida PTA's members include thousands of families, students, teachers and administrators across Florida. Their members include migratory children and their parents; teachers of English Language learners, their students, and those students' parents; and teachers, parents, and students in high-need schools, all of whom would benefit from the withheld funds. Florida PTA student members will suffer the same harms facing the School District Plaintiffs described above, including lack of access to cut programs and lost academic opportunities. And Florida PTA teacher members will suffer the same harms facing the Teacher Union Plaintiffs, including loss of professional development and layoffs.

114.    Plaintiff P.S. 305 is also harmed by the withholding of Formula Funds. P.S. 305 has already prepared a strategic plan for the upcoming school year based on the expectation that the Department would release the Formula Funds on July 1, as it has for decades. It will now need to redirect its efforts to helping parents and students who will be affected by the recent cuts, instead of engaging in the policy advocacy, parent leadership development, and school-based organizing that it would have been conducting had the Department released the funds as

expected. P.S. 305's parent leaders will likewise suffer harm because their children rely on the funds at issue to support their education.

## CLAIMS FOR RELIEF

### COUNT ONE
### APA ARBITRARY AND CAPRICIOUS
### 5 U.S.C. § 706(2)(A)
### (Against Department of Education and Secretary McMahon)

115.    All preceding and subsequent paragraphs are incorporated herein by reference.

116.    The Administrative Procedure Act ("APA") provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

117.    The Department maintained a long-time policy of making grants and allotting Formula Funds to states on or around July 1, as soon as the funds became available pursuant to the applicable appropriations laws.

118.    The Department has now changed its policy, deciding that it "will not be issuing Grant Award Notifications obligating funds for these programs on July 1," and will not be allotting the Formula Funds on July 1, "prior to completing [a] review" to ensure the funds "are spent in accordance with the President's priorities" and other potential policy processes.

119.    The Department's change in policies constitutes final agency action reviewable under 5 U.S.C. § 704.

120.    The Department's action is arbitrary and capricious because, among other things, the Department has not provided a reasoned explanation for its new policy. The Department failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't*

*of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

121.    The Department's action is also arbitrary and capricious because it is substantively unreasonable. *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between claims that agency action "was substantively unreasonable" and claims that "the agency has failed to adequately address all of the relevant factors or to adequately explain its [decision]").

122.    The Department's action is also arbitrary and capricious because it relied on factors which Congress has not intended it to consider, failed to consider an important aspect of the problem, and offered an explanation for its decision that runs counter to the evidence before the agency.

123.    The Department's action is also arbitrary and capricious because it did not acknowledge that it was changing policies, *see FCC v. Fox Television Stations*, 566 U.S. 502 (2009), and because the Department failed to consider the reliance interests of States, their subrecipients, and other impacted stakeholders, including Plaintiffs. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (quotation and citations omitted)). In the Department's notification to states that the Formula Funds would be not made available on July 1, 2025—and in subsequent public statements—the Department did not acknowledge its change in policies and made no mention of the reliance interests at issue here, including that: school districts have already budgeted and planned for the upcoming school year and set up significant programs and hired staff based on the expectation of their formula grant funds, teachers have accepted job offers or engaged in long-term professional

development courses in reliance on the availability of ESEA funds, and students and families

have relied on the continued existence of programs that these funds support.

### COUNT TWO
### APA CONTRARY TO LAW, CONTRARY TO CONSTITUTIONAL RIGHT, AND EXCEEDS STATUTORY AUTHORITY
### 5 U.S.C. §§ 706(2)(A)–(C)
### (Against Department of Education and Secretary McMahon)

124.    All preceding and subsequent paragraphs are incorporated herein by reference.

125.    The APA provides that a court "shall" "hold unlawful and set aside agency

action" found to be "not in accordance with law[,]" "contrary to constitutional right, power,

privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right[.]" 5 U.S.C. §§ 706(2)(A)–(C).

126.    The Department's new policy of not allotting funds and/or issuing Grant Award

Notifications on July 1, pending the outcome of an unauthorized "review," violates each of the

relevant authorizing statutes regarding the Formula Grant Programs.

127.    With respect to Title I-C funds, "the Secretary shall make grants to State

educational agencies, or combinations of such agencies, to establish or improve, directly or

through local operating agencies, programs of education for migratory children in accordance

with this part," and "each State (other than the Commonwealth of Puerto Rico) is entitled to

receive" an allocation determined by a formula based on the number of eligible migratory

children in the state. 20 U.S.C. §§ 6392, 6393(a).

128.    With respect to Title II-A funds, "the Secretary shall allot funds" appropriated for

Title II-A programs as determined by a formula based on the number of individuals aged 5

through 17 in the state. 20 U.S.C. §§ 6611(2)(A)(iv), (3).

129.    With respect to Title III-A funds, "[i]n the case of each State educational agency

having a plan approved by the Secretary for a fiscal year," "the Secretary shall make a grant for

the year to the agency." 20 U.S.C. § 6821(a). "The grant shall consist of the allotment determined for the State educational agency under subsection (c)." Id. Subsection (c) in turns provides that "the Secretary shall allot to each State educational agency having a plan approved" an amount determined by a formula based on the number of English learners in the state. Id. § 6821(c)(2)(A).

130.    With respect to Title IV-A funds, "the Secretary shall allot to each State having a plan approved" an amount determined by a statutory formula. 20 U.S.C. § 7113(b)(1)(A).

131.    With respect to Title IV-B funds, "the Secretary shall allot to each State for the fiscal year an amount" determined by a statutory formula. 20 U.S.C. § 7172(b)(1).

132.    The Department's policy violates Titles I-C, II-A, III-A, IV-A, and IV-B by, among other things, not making grants or allotting funds on July 1 to states with approved plans so that Defendants can conduct a review to ensure funds are spent consistent with the President's priorities; by conditioning the grants, allocations, and allotments on non-statutory criteria; and by not awarding grants and making formula allocations and allotments for States with approved plans as a ministerial matter.

133.    The Department's policy also violates the 2025 Continuing Resolution and/or the Impoundment Control Act by withholding the obligation of the Formula Funds beyond July 1, 2025. The default rule is that agencies may not intentionally "defer" obligating or expending appropriations, meaning to withhold[] or delay[] the obligation or expenditure of budget authority (whether by establishing reserves or otherwise)." 2 U.S.C. § 682(1)(A). In the Impoundment Control Act (ICA), Congress prescribed the exclusive circumstances where an agency *is* permitted to refrain from spending appropriations. For most appropriations, the ICA sets forth three circumstances where an agency may defer funds. *See id.* § 684(b).

134.    However, an ICA provision known as the "Fourth Disclaimer" provides that "[n]othing contained in this Act . . . shall be construed as superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." *See id.* § 681(4). This provision prohibits any deferrals—for any amount of time for any reason—of appropriations that Congress mandated be obligated to particular recipients in particular amounts, such as through formula funding. In light of the Formula Disclaimer, the Formula Funds are "not eligible for withholding under any circumstance." Applicability of the Impoundment Control Act to Reduction of Agency Functions File, B-337375, at 2 (June 16, 2025). Defendants' intentional withholding of the Formula Funds beyond July 1 therefore violates the 2025 Continuing Resolution that appropriated the Formula Funds and directed that those funds be available on July 1, 2025.

135.    The Department's policy also violates the constitutional separation of powers by unlawfully impounding funds in derogation of Congress' power of the purse, and in refusing to comply with Congress' mandates to make grants and allot funds.

136.    If the President submits a proposal to Congress to rescind the Formula Funds pursuant to the Impoundment Control Act's procedures, *see* 2 U.S.C. § 683(a), that would have no bearing on Defendants' legal violations or mandates, because any such rescission proposal would be null and void in light of the Fourth Disclaimer. The ICA sets forth special procedures by which the President may propose to Congress to rescind unobligated appropriations. A rescission proposal sent to Congress pursuant to the ICA is treated differently from all other proposed legislation, including in that it is "privilege[d]" status and cannot be filibustered in the Senate, meaning it is subject to only a 50-vote threshold. *See id.* §§ 688(b), (d).

137.    Because the relevant statutes "require[] the obligation of" the Formula Funds, *id.* § 681(4), they fall under the Fourth Disclaimer and are "not eligible for . . . rescission consistent with ICA procedures," B-337375, at 12. That means any rescission proposal sent to Congress for the Formula Funds would be invalid, and Defendants could not avail themselves of the ICA provision that allows an agency to refrain from obligating funds for 45 days while Congress considers a rescission proposal. 2 U.S.C. § 683(b). In other words, Defendants mandatory legal duties to make grants and allot the Formula Funds to SEAs would not be affected should Defendants attempt to circumvent those duties by submitting a rescission proposal to Congress.

### COUNT THREE
### APA UNLAWFULLY WITHHELD OR DELAYED ACTION
### 5 U.S.C. § 706(1)
### (Against Department of Education and Secretary McMahon)

138.    All preceding and subsequent paragraphs are incorporated herein by reference.

139.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

140.    The Department has  mandatory, non-discretionary duties under the relevant statutes to make grants and allotments in precise formula amounts to states with approved plans.

141.    The Department has not complied with these non-discretionary duties to take the ministerial actions of making grants and allotting funds per the relevant formulas.

142.    Under the 2025 Continuing Resolution and the Impoundment Control Act, including 2 U.S.C. § 681(4), the Department also has mandatory, non-discretionary duties to obligate the Formula Funds when they become available on July 1 and to not withhold the funds beyond that date for policy reasons.

143.    The Department has therefore "violated section 706(1) of the APA by unlawfully withholding the [formula grants and allotments] that [the Department] is statutorily required to

provide." *Widakuswara v. Lake*, No. 1:25-cv-01015, 2025 WL 1166400 at *15 (D.D.C. Apr. 22, 2025) (appeal pending).

144.    In the alternative, the Department's decision to not make grants and allot funds to states with approved plans on July 1, 2025, per the statutory formulas, constitutes agency action unreasonably delayed.

145.    The Department's withholding of the Formula Funds beyond July 1 would remain unlawful regardless of whether the President submits a proposal to rescind those funds pursuant to the Impoundment Control Act, because the Formula Funds fall under the Fourth Disclaimer.

## COUNT FOUR
## APA ARBITRARY AND CAPRICIOUS
## 5 U.S.C. § 706(2)(A)
### (Against Office of Management and Budget and Director Vought)

146.    All preceding and subsequent paragraphs are incorporated herein by reference.

147.    The Administrative Procedure Act ("APA") provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

148.    OMB maintained a long-time policy of, prior to July 1 of a given year, apportioning without restriction the appropriations underlying the Formula Funds that become available on July 1 of that year.

149.    On information and belief, OMB has adopted a new policy to not apportion to the Department by July 1, 2025 the appropriations underlying the Formula Funds, to ensure that the Formula Funds are used in accordance with the President's policy priorities.

150.    OMB's policy constitutes final agency action reviewable under the APA.

151.    OMB's policy is arbitrary and arbitrary and capricious because, among other things, OMB has not provided a reasoned explanation for its new policy. OMB has failed to

"examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com.*, 588 U.S. at773 (quoting *State Farm*, 463 U.S. at 43.

152.    OMB's policy is also arbitrary and capricious because it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, and offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

153.    OMB's policy is also arbitrary and capricious because it did not acknowledge that it was changing policies, *see Fox*, 556 U.S. at 515, and because OMB entirely failed to consider the reliance interests of states, grantees and their subrecipients, and other impacted stakeholders, including Plaintiffs.  "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *See Regents of the Univ. of Cal.*, 591 U.S. at 30 (quotation and citations omitted)). In OMB's statements, OMB did not not acknowledge its change in policies and made no mention of the reliance interests at issue here, including that: school districts have already budgeted and planned for the upcoming school year and set up significant programs and hired staff based on the expectation of their formula grant funds, teachers have accepted job offers or engaged in long-term professional development courses in reliance on the availability of ESEA funds, and students and families have relied on the continued existence of programs that these funds support.

**COUNT FIVE**
**APA CONTRARY TO LAW, CONTRARY TO CONSTITUTIONAL RIGHT,**
**AND EXCEEDS STATUTORY AUTHORITY**
**5 U.S.C. § 706(2)(A)–(C)**
**(Against Office of Management and Budget and Director Vought)**

154.    All preceding and subsequent paragraphs are incorporated herein by reference.

155.    The APA provides that a court "shall" "hold unlawful and set aside agency

action" found to be "not in accordance with law[,]" "contrary to constitutional right, power,

privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right[.]" 5 U.S.C. § 706(2)(A)–(C).

156.    OMB's policy violates the 2025 Continuing Resolution and/or the Impoundment

Control Act by effectuating an unlawful deferral of the obligation the Formula Funds beyond

July 1, 2025. OMB's non-apportionment of the Formula Funds constitutes a deferral since it is

"any other type of Executive action or inaction which effectively precludes the obligation or

expenditure of" appropriations. 2 U.S.C. § 682(1)(A). Because the Formula Funds fall under the

Fourth Disclaimer, OMB may not preclude the Department from spending the Formula Funds

beyond the date upon which they became available OMB's policy is therefore contrary to law.

157.    OMB's policy also violates the Anti-Deficiency Act. OMB violated that Act when

it did not apportion the Formula Funds to the Department within 30 days of the enactment of the

2025 Continuing Resolution. 31 U.S.C. § 1513(b)(2)(B). .

158.    OMB has also violated the Anti-Deficiency by making apportionment decisions

based on considerations other than "prevent[ing] obligation or expenditure at a rate that would

indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. §

1512(a). .

159.    In not apportioning the funds before July 1, 2025, OMB has unlawfully

established a reserve for policy reasons not permitted by the Act. *See* 31 U.S.C. § 1512(c)(1).

42

160.     OMB's policy also violates the constitutional separation of powers by unlawfully preventing the obligation and expenditure of funds in derogation of Congress' power of the purse and without constitutional authority, and by defying Congress' mandates that the Department shall make grants and allot funds pursuant to specific formulas.

161.     OMB's withholding of the Formula Funds beyond July 1 would remain unlawful regardless of whether the President submits a proposal to rescind those funds pursuant to the Impoundment Control Act, because the Formula Funds fall under the Fourth Disclaimer.

**COUNT SIX**
**APA UNLAWFULLY WITHHELD OR DELAYED ACTION**
**5 U.S.C. § 706(1)**
**(Against Office of Management and Budget and Director Vought)**

162.     All preceding and subsequent paragraphs are incorporated herein by reference.

163.     The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

164.     OMB also has a mandatory duty to apportion the Formula Funds to the Department within 30 days of the enactment of an appropriations law appropriating the Formula Funds, and certainly before July 1, 2025 where the Formula Funds for a fiscal year were appropriated more than 30 days before that date.

165.     OMB has not complied with these mandatory duties.

166.     OMB has therefore violated section 706(1) of the APA by unlawfully withholding the apportionment of funds.

167.     In the alternative, OMB's decision not to apportion the appropriations underlying the Formula Funds before July 1, 2025 constitutes agency action unreasonably delayed.

168.    OMB's withholding of the Formula Funds beyond July 1 would remain unlawful regardless of whether the President submits a proposal to rescind those funds pursuant to the Impoundment Control Act, because the Formula Funds fall under the Fourth Disclaimer.

**COUNT SEVEN**
**SEPARATION OF POWERS**
**(Against All Defendants)**

169.    All preceding and subsequent paragraphs are incorporated herein by reference.

170.    This Court has inherent equitable power to enjoin unconstitutional executive conduct. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

171. The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. The President lacks the unilateral authority to modify or amend duly enacted Legislation—the President may only "approve all the parts of a Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation omitted); *see* U.S. Const. art. I, § 7, cl. 2. The President cannot delegate powers to other executive branch officials that violate the Constitution.

172. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018); *see* U.S. Const., art. I, § 8, cl. 1; *id.*, § 9, cl. 7.

173. Congress' power of the purse derives from two constitutional provisions. The Appropriations Clause dictates that the Executive Branch must spend funds, and may only spend funds, as directed and permitted by Congress.  U.S. Const., art. I, § 9, cl. 7. The Appropriations Clause "was one of the most important authorities allocated to Congress in the Constitution's

necessary partition of power among the several departments." *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (quotations omitted).

174. The only key constitutional spending provision, the Spending Clause, vests Congress with exclusive power to distribute funds to states and others to promote "the general welfare," *id.*, art. I, § 8, cl. 1.. "Incident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). And because "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare," *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021), the executive branch may not impose conditions on the distribution of funds that Congress has not authorized.

175. Exercising its constitutional authorities, Congress mandated that, for states with approved plans, the Secretary of Education make grants and allot the appropriated Formula Funds as determined only by the relevant statutory formulas. Defendants refusal to comply with these statutory mandates violates the constitutional separation of powers. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

176. Defendants also are violating the separation of powers and the Spending Clause in particular in adding conditions to the release of Formula Funds that Congress did not impose. Congress established the Formula Funding Programs for specified purposes, and Congress has consistently appropriated funding for those programs. Nothing in those laws authorizes Defendants to impose conditions on that funding that Congress did not impose, including conditions intended to advance the President's unrelated policy goals. Defendants' imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the

executive's] policy objectives strikes at the heart of … the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020).

177. Defendants' actions violate the separation of powers in infringing on Congress' legislative authority and power of the purse, in failing to faithfully execute Congress's laws, and in attempting to amend, modify, or partially veto duly enacted legislation.

**COUNT EIGHT**
**MANDAMUS ACT**
**28 U.S.C. § 1361**
**ALL WRITS ACT**
**28 U.S.C. § 1651**
**(Against All Defendants)**

178. All preceding and subsequent paragraphs are incorporated herein by reference.

179. The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

180. The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

181. The Department and Defendant McMahon have mandatory, non-discretionary duties under the relevant statutes to make grants and allotments in precise formula amounts to States with approved plans.

182. Defendants have a mandatory, non-discretionary duty to ensure that the Formula Funds available on July 1 for States with approved plans are obligated on that date, to avoid carrying out an unlawful deferral of appropriations.

183. OMB and Defendant Vought have a mandatory duty to apportion funds at a rate that considers only the need to prevent the obligation or expenditure of funds at a rate that would

indicate a necessity for a deficiency or supplemental appropriation for the period. 31 U.S.C. § 1512(a).

184.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to act.

### COUNT NINE
### ULTRA VIRES
### (Against Defendants McMahon and Vought)

185.    All preceding and subsequent paragraphs are incorporated herein by reference.

186.    An agency acts ultra vires when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021).

187.    Judicial "[r]eview for ultra vires acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (internal quotations and citation omitted).

188.    This Court has inherent equitable power to enjoin ultra vires conduct by Defendants. No statute, constitutional provision, or other source of law authorizes Defendants to withhold for policy reasons the making of grants and allotment of the Formula Funds for States with approved plans, and no authority authorizes Defendants to undertake a deferral of the Formula Funds for policy reasons. To the contrary, the relevant statutes require Defendants to make the relevant formula grants and allot the Formula Funds for States with approved plans, and to obligate on July 1, 2025, the Formula Funds that became available on that date for obligation to states with approved plans.

189.    Defendants' actions are therefore ultra vires.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests that the Court:

A.     Declare unlawful and set aside the Department's policy of "not issuing Grant Award Notifications" obligating the Formula Funds, and not allotting the Formula Funds, on July 1, pending policy reviews and processes, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

B.     Declare unlawful and set aside the Department's withholding or unreasonable delays of their mandatory, non-discretionary duties to make grants and allotments in precise formula amounts to States with approved plans, and to obligate the Formula Funds when they become available on July 1 and to not withhold the funds beyond that date.

C.     Declare unlawful and set aside OMB's policy to not apportion to the Department by July 1, 2025 the appropriations underlying the Formula Funds, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C).

D.     Declare unlawful and set aside OMB's withhold or unreasonable delays of performing their mandatory duties to timely apportion funds to the Department;

E.     Issue preliminary and permanent relief, including but not limited to injunctive relief, ordering Defendants: (1) to cease their carrying out their unlawful policies and actions, and to cease withholding or unreasonably delaying the making of grants and the allotting of Formula Funds as required by law; (2) to immediately issue the requisite Grant Award

Notifications, allocations, and allotments, regardless of any policy reviews or processes that are

ongoing, and (3) to take all other steps necessary to make the funds available to SEAs and their

subrecipients without conditions not prescribed by Congress;

      F.      Award Plaintiffs reasonable costs and attorneys' fees; and

      G.      Grant any other relief that the Court deems fit and proper.

July 21, 2025                     Respectfully submitted,

*/s/ Miriam Weizenbaum*
Miriam Weizenbaum (RI Bar # 5182)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Miriam@dwbrlaw.com

*/s/ Steven Y. Bressler*
Steven Y. Bressler (D.C. Bar No. 482492)[+]
Kali Schellenberg (MA BBO No. 694875)[+]
Skye Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kschellenberg@democracyforward.org
sbressler@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar No. 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Kyla M. Snow (OH Bar No. 96662)[+ ^]
John Robinson (D.C. Bar No. 1044072)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
kyla@jacobsonlawyersgroup.com

*Counsel for All Plaintiffs*

Robert T. Reilly, Jr. (NY Bar No. 2598514)[+]
52 Broadway, 9th Floor
New York, NY 10004
(518) 213-6000
Robert.Reilly@nysut.org

*Counsel for Plaintiff New York State United Teachers*

[+] Pro hac vice forthcoming
[^] Not admitted in the District of Columbia. Practice
   supervised by members of the D.C. bar.