# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ANCHORAGE SCHOOL DISTRICT, *et al.*<br><br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*<br><br><br>*Defendants*. | Case No. 25-cv-00347<br><br>**EXPEDITED RELIEF REQUESTED UNDER LR Cv 9** |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION AND TO PRELIMINARILY
## SET ASIDE AND STAY AGENCY ACTION

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

   A.   The Elementary and Secondary Education Act ................................................. 2

   B.   The ESEA's Formula Grant Programs ............................................................. 4

   C.   Each State Has an Approved Consolidated Plan and is Eligible for Funding .................. 6

   D.   Congress Has Consistently Funded the Formula Grant Programs..................................... 7

   E.   Congress Forward-Funds Appropriations for ESEA Grants to Allow for Timely Awards 9

   F.   The Department Historically Obligates Formula Funds on July 1 of Each Year ............. 10

   G.   Defendants Fail to Make Appropriated Funds Available ................................................. 11

   H.   Plaintiffs Are Harmed by the Department's Failure to Make Appropriated Funds Available As Required....................................................................................................... 13

LEGAL STANDARD..................................................................................................... 15

ARGUMENT ................................................................................................................. 16

   I.   Plaintiffs Are Likely to Succeed on the Merits.......................................................... 16

      A.   Defendants' Actions Violate the Administrative Procedure Act.................................... 17

         1.   Defendants' New Policies Not to Allot or Apportion Funds by July 1, Pending a Policy Review, Are Final Agency Actions ........................................................... 17

         2.   Defendants' Actions Are Arbitrary and Capricious and An Abuse of Discretion 19

            a)   Defendants' Actions Are Substantively Unreasonable.................................... 19

            b)   Defendants Did Not Provide a Reasoned Explanation ................................... 20

         3.   Defendants' Actions are Contrary to Statutes......................................................... 23

         4.   Defendants' Actions Are Contrary to the Constitutional Separation of Powers......................................................................................................................... 27

         5.   Defendants Have Unlawfully Withheld or Unreasonably Delayed Agency Action......................................................................................................................... 30

      B.   Defendants Are Violating the Constitution................................................................. 33

C.  Defendants' Actions Are *Ultra Vires* ........................................................... 33

D.  Defendants' Actions Are Unlawful Regardless of Whether the President Submits a Rescission Proposal for the Formula Funds, which Would Itself be Illegal .............. 35

II.  Plaintiffs Will Suffer Irreparable Injury Absent Preliminary Relief ................................ 35

III.  The Balance of Equities and the Public Interest Favor Plaintiffs .................................... 42

IV.  The Court Should Enter Appropriate Preliminary Relief .................................................. 43

CONCLUSION .................................................................................................................... 45

## TABLE OF AUTHORITIES

### Cases

*Aids Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d 121 (D.D.C. 2025)................. 25, 34

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102 (9th Cir. 2025)............................. 31

*Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ................................................. 21

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ........................................... 33, 34

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................... 17, 18

*Biden v. Texas*, 597 U.S. 785 (2022) .............................................................................................. 18

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36 (1st Cir. 2010) ....................... 16

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) ..................................................... 44

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)................................................................................. 42

*California v. McMahon*, No. 1:25-cv-00329 (D.R.I.)...........................................................................

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) ........................... 43

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020).......................................... 43

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........................................ 28, 29, 30

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................................. 33

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020).................................................................. 29

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) ............................................ 27

*City of New York v. Clinton*, 985 F. Supp. 168 (D.D.C. 1998)...................................................... 26

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)............................................................... 33

*Collins v. Yellen*, 594 U.S. 220 (2021) ......................................................................................... 33

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) .............. 28, 29

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).................... 16, 44

*Dabney v. Reagan*, 542 F. Supp. 756 (S.D.N.Y. 1982) .....................................................................

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)......................................................... 20, 22

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................................ 23

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................................... 21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010).................................... 33

*Ghannad-Rezaie v. Laitinen*, 757 F. Supp. 3d 148 (D. Mass. 2024) ............................................ 32

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)..................................................................... 29

*Kendall v. United States*, 37 U.S. 524 (1838) ........................................................................... 29

*La. Pub. Serv. Comm'n v. FCC*, 576 U.S. 355 (1986)................................................................. 33

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949)................................................ 34

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .......................................

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) .......................................................... 19

*Maine v. USDA*, No. 1:25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)...................... 36

*Martin Luther King Jr., Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368 (W.D. Wash. June 3, 2025)........................................................................................................................ 30

*Massachusetts v. NIH*, No. 1:25-cv-10388, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ............ 20,

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .................................................................................... 42

*Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932 (D.C. Cir. 2017)........ 19

*N.H. Hosp. Ass'n v. Burwell*, No. 1:15-cv-00460, 2016 WL 1048023 (D.N.H. Mar. 11, 2016).. 16

*Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020)................................................ 18

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022)....................

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ...................... 43

*New York v. Trump*, 769 F.Supp.3d 119 (D.R.I. 2025) ...................................... 19, 20, 29, 36, 42

*Nken v. Holder,* 556 U.S. 418 (2009) ......................................................................................... 15

*Novack v. Miller*, 727 F. Supp. 3d 70 (D. Mass. 2024) ............................................................... 32

*Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271 (D. Mass. Apr. 18, 2025) ...................... 43

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025)........................................................ 30

*Plyler v. Doe*, 457 U.S. 202 (1982)............................................................................................. 42

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) .................................................... 42

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...................................................... 42

*Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47 (D.R.I. 2023) ................................. 16

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018)............................................. 30,

*South Dakota v. Dole*, 483 U.S. 203 (1987) ................................................................. 29

*State of Me. v. Goldschmidt*, 494 F. Supp. 93 (D. Me. 1980)................................................

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)...................................... 31

*Tex. Educ. Agency v. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021) ...................................... 29, 30

*Town of Wellesley v. Fed. Energy Reg. Comm'n*, 829 F.2d 275 (1st Cir. 1987) ........................ 31

*Train v. Campaign Clean Water, Inc.*, 420 U.S. 136 (1975) ............................................... 24

*Train v. City of New York*, 420 U.S. 35, 39 (1975).................................................... 24, 29

*Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ........................... 16,

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................... 18

*United States v. Coal. for Buzzards Bay*, 644 F.3d 26 (1st Cir. 2011) ....................................... 21

*United States v. Texas*, No. 22-58 (U.S. Nov. 29, 2022) ............................................. 44

*West Virginia v. EPA*, 577 U.S. 1126 (2016)............................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................... 15

*Woonasquatucket River Watershed Council v. USDA*, No.

**Statutes**

2 U.S.C. § 681 .......................................................................................... 25

2 U.S.C. § 682 .......................................................................................... 25

2 U.S.C. §

20 U.S.C. § 1223 ........................................................................................ 9

20 U.S.C. § 6601 ........................................................................................ 5

20 U.S.C. § 6692 ........................................................................................ 4

20 U.S.C. § 7011 .................................................................................................... 9

20 U.S.C. § 7172 ............................................................................................... 9, 23

20 U.S.C. § 7173 ................................................................................................. 4, 6

20 U.S.C. § 7174 .................................................................................................... 9

20 U.S.C. § 7801 .................................................................................................... 6

20 U.S.C. § 7842 .................................................................................................... 6

20 U.S.C. § 7871 .................................................................................................... 6

20 U.S.C. § 7881 .................................................................................................... 3

20 U.S.C. § 7907 .................................................................................................... 4

31 U.S.C. § 1512 .................................................................................................. 27

31 U.S.C. § 1513 ............................................................................................. 27, 32

5 U.S.C. § 704 ..................................................................................................... 17

5 U.S.C. § 705 ................................................................................................. 16, 43

5 U.S.C. § 706 ............................................................................................. 27, 30, 32

Pub. L. No. 114-9, 129 Stat. 1802 (Dec. 10, 2015) ............................................ 3

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ......................................... 7, 8

Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) .................................................. 8

Pub. L. No. 89-10, 79 Stat. 27 (Apr. 11, 1965) .................................................. 2

### Constitutional Provisions

U.S. Const. art. I, § 8 .......................................................................................... 28

U.S. Const. art. I, § 9 .......................................................................................... 28

U.S. Const. art. II, § 3 ......................................................................................... 29

### Other Authorities

Brett Samuels, *White House likely to send another rescissions package to Congress*, The Hill
(July 17, 2025), https://perma.cc/H9WR-K6J7 ...................................... 13, 18

Cong. Rsch. Serv., R43482, *Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations* (June 10, 2019) ...................... 21

Cong. Rsch. Serv., R44477, *Department of Education Funding: Key Concepts and FAQ* (Feb. 19, 2019) ......................................................................................................................

*Every Student Succeeds Act (ESSA)*, U.S. Dep't of Educ., https://perma.cc/C8Q9-Z6QS ............. 3

GAO, B-203057, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ................................................ 25

GAO, B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017) ............................................ 25

GAO, B-337137, 2025 WL 1521234 (Comp. Gen. May 22, 2025) ............................................ 26

GAO, B-337375, 2025 WL 1714233 (Comp. Gen. June 16, 2025) ........................................ 26,

Gov't Accountability Office, *A Glossary of Terms Used in the Federal Budget Process*, GAO-050-734SP (Sept. 2005) ...................................................................................................... 10

Letter from 600 organizations to Linda McMahon, Sec'y of Educ., and Russell Vought, Dir. of Off. of Mgmt. and Budget (July 17, 2025), https://perma.cc/GF4C-9RS3 ...................... 13

Letter from Congress Members to Linda McMahon, Sec'y of Educ. (July 7, 2025), https://perma.cc/7WQY-Y8XN ...................................................................................... 12

Letter from Congress Members to Linda McMahon, Sec'y of Educ., and Russell Vought, Dir. of Off. of Mgmt. and Budget (July 10, 2025), https://perma.cc/YM3T-VFUE ................... 12

Letter from Michael V. Lawler, Member of Congress, to Donald J. Trump, President of the United States (July 9, 2025), https://perma.cc/FCW6-2LRU ........................................... 12

Letter from Senators to Linda McMahon, Sec'y of Educ., and Russell Vought, Dir. of Off. of Mgmt. and Budget (July 10, 2025), https://perma.cc/VF8N-7SSE ................................. 12

Letter from Senators to Russell Vought, Dir. of the Off. of Mgmt. and Budget (July 16, 2025), https://perma.cc/AA2N-JTQ6 ......................................................................................... 12

Mark Lieberman, *Trump's Education Budget Calls for Billions in Cuts, Major Policy Changes*, Educ. Week (May 30, 2025), https://perma.cc/J62D-JP5N .............................................. 11

NCSL, *Every Student Succeeds Act: Information and Resources* (Sep. 27, 2018), *available at* https://perma.cc/8JYB-MV82 ............................................................................................ 7

Peat, Marwick, Mitchell & Co., *A Study of Late Funding of Elementary and Secondary Education Programs*, prepared for the U.S. Office of Educ. (Feb. 1976) ........................ 21

Rebecca R. Skinner and Isobel Sorenson, Cong. Rsch. Serv., R48165, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): An Analytical Review of the Allocation Formulas* (2004) .................................. 10

Rebecca R. Skinner, Cong. Rsch. Serv., R45977, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer* (2024).......... 8

*Recorded Remarks on the Message on Education*, The American Presidency Project, https://perma.cc/T2MP-MVSX ................................................................................. 3

Susan Crabtree, *OMB: States Used Education Grants for 'Left Wing Agenda'*, Real Clear Politics (July 5, 2025), https://perma.cc/4KS2-A296 ............................................................ 12, 21

The Federalist No. 28 (James Madison) (Clinton Rossiter, ed., 1961)........................................ 28

**INTRODUCTION**

The clock is ticking on the start of the school year, and school districts, teachers, and parents should be finalizing their plans on programming and allocation of their time and resources for the upcoming semester. To help these stakeholders cement their plans and actually carry out their activities, Congress has provided formula grants to states under the Elementary and Secondary Education Act (ESEA), and has made these funds available to states on July 1, ahead of the academic year. Congress has for decades provided such critical funding, and cash-strapped schools and their stakeholders rely heavily on this predictable timeline and stream of resources. But now, for the first time ever and with no advance notice, the Department of Education and the Office of Management and Budget have decided not to release the formula funds on July 1. They have provided virtually no explanation for their decision, other than their desire to conduct a "review" to ensure the funds are spent consistent with the President's policy priorities. They have cited no legal authority for their abrupt change in policies, nor have they provided any timeline in which they will release the funds, if ever.

Defendants' actions have already resulted in mass chaos and irreparable harm, multiplying by the day. School districts cannot finalize their budgets and have begun cancelling programs and laying off teachers. The teachers that remain are left without the resources needed to do their jobs. And students, the ultimate beneficiaries of the formula grant programs that Congress enacted and funded, will suffer all of the consequences of this massive disruption to the education system. Plaintiffs—which include school districts, teachers unions, a statewide Parent Teachers Association (PTA), and a Miami-based education advocacy group—seek a preliminary injunction to ward off the imminent, irreparable harms that they face.

1

A preliminary injunction is well-warranted. Not only are the irreparable harms presented enormous, but Defendants' actions are unlawful many times over. They are arbitrary and capricious in nearly every way that an agency action can be arbitrary and capricious. Defendants did not provide reasoned explanations for their actions, relied on considerations that Congress did not permit, failed to acknowledge their change in policies, and completely ignored the serious reliance interests at stake. Defendants' actions also are contrary to multiple federal statutes. In the ESEA, Congress imposed non-discretionary duties on Defendants to allot the formula funds to each state pursuant to objective, mathematical formulas. The statutes do not permit the withholding of funds for consideration of the President's priorities. Moreover, in the continuing resolution that Congress enacted in March 2025, Congress mandated that Defendants release the funds on July 1. Formula funds, unlike other appropriations, may not be intentionally withheld for any period of time. Defendants are also violating the constitutional separation of powers in defying Congress' mandates, including mandates enacted pursuant to Congress' exclusive power of the purse.

All of the relevant factors overwhelmingly favor a swift injunction or stay. Plaintiffs respectfully request that the Court set Defendants' response deadline on this motion to be Monday, July 28, so that this action is coordinated with the parallel action brought by certain states in *California v. McMahon*, No. 1:25-cv-00329 (D.R.I.).

## BACKGROUND

### A.  The Elementary and Secondary Education Act

On April 11, 1965, President Lyndon Johnson signed into law the Elementary and Secondary Education Act (ESEA)—a measure designed to combat poverty and close education gaps by providing federal funds to schools that serve relatively higher proportions of low-income students. *See* Pub. L. No. 89-10, 79 Stat. 27 (Apr. 11, 1965). When the Act was introduced in

January of that year, President Johnson declared education as "the guardian genius of our democracy" and described the funds provided by the ESEA as a "small price to pay for developing the country's most priceless resource, our young people." *Recorded Remarks on the Message on Education*, The American Presidency Project, https://perma.cc/T2MP-MVSX.

Congress approved the ESEA with bipartisan support, and through dozens of reauthorizations and amendments, Congress has reinforced time again the national priority of supporting the academic achievement of children most in need. Most recently, in 2015, a bipartisan Congress reauthorized and amended the ESEA in the Every Student Succeeds Act (ESSA), *see* Pub. L. No. 114-9, 129 Stat. 1802 (Dec. 10, 2015). This legislation built on prior efforts to expand academic opportunities for all students while incorporating accountability measures for states to demonstrate academic improvements. *See Every Student Succeeds Act (ESSA)*, U.S. Dep't of Educ., https://perma.cc/C8Q9-Z6QS.

The ESEA adopts a multi-faceted approach to supporting academic achievement. Through its broadest funding program, the ESEA provides grants to support school districts and other Local Educational Agencies (LEAs) that have high concentrations of children from low-income families. *See* 20 U.S.C. §§ 6311–6399. The ESEA also provides funds for more targeted purposes, as described in more detail below.

To reach as many students as possible, the ESEA guarantees that students in private schools have adequate educational support, too—the Act requires that public schools receiving certain ESEA funds provide equitable educational services to eligible private school children, teachers, or other personnel. *Id.* § 7881(a)(1), (b)(1). To ensure the funds result in tangible improvements, the Act mandates that states create plans incorporating statewide academic standards and objective factors, such as standardized test scores and chronic absenteeism, for

measuring academic success. *Id.* §§ 6311, 7173. And to reinforce the effectiveness of its grant programs, the ESEA mandates the funding recipients make efforts to engage parents in their children's education, such as by inviting parental input on state and local plans to carry out a programs' purposes. *Id.* § 6611(d)(3).

At the same time, the ESEA protects local control over "instructional content, curriculum, and related activities." *Id.* §§ 7907(c), (d). In particular, it provides states flexibility to set their own academic standards, *id.* § 6311, and prohibits the "Secretary or any other officer or employee of the Federal Government" from "mandat[ing], directi[ing], or control[ling]" "instructional content or materials, curriculum, program of instruction, academic standards, or academic assessment," *id.* § 6692(a)(1).

### B. The ESEA's Formula Grant Programs

The majority of schools nationwide benefit from ESEA funds and specifically from the ESEA grant programs at issue here: Titles I-C, II-A, III-A, and IV-A ("Formula Grant Programs"). Each of these programs allows local schools to offer tailored support to students to help them achieve academic success.

Title I-C (20 U.S.C. §§ 6391–6399) funds "high-quality and comprehensive educational programs" for migratory children, defined as children who have moved school districts during the preceding 3 years out of economic necessity due to a family member's job "as a migratory agricultural worker or a migratory fisher." 20 U.S.C. § 6399. Congress designed the Title I-C program to help migratory children "overcome educational disruption" caused by inter-district moves, implementing measures to allow them to "receive full and appropriate opportunities to meet the same challenging State academic standards that all children are expected to meet," *id.* § 6391, and prioritizing students who are most at risk of failing or dropping out, *id.* § 6394(d). Those measures include improving coordination between educational agencies within and

between states for the transfer of school credits and educational and health records, *id.* § 6398(a), (b), offering literacy services, providing specific professional development for instructors, and tailoring the provision of services under other programs (such as English language instruction) to the unique needs of migratory children, *id.* § 6394(b), (c).

Title II-A (20 U.S.C. §§ 6611–6614) funds activities to recruit and retain high-quality teachers, principals, and other school leaders with the aim of "increas[ing] student achievement" and "provid[ing] low-income and minority students greater access to effective" instruction. *Id.* § 6601. Grants under this section support schools with, among other activities, developing rigorous teacher evaluations, improving teacher recruitment methods, reducing class sizes to improve student achievement, and providing "high-quality, personalized professional development that is evidence-based" and focused on helping students succeed. *Id.* § 6613.

Title III-A (20 U.S.C. §§ 6811–6874) funds language instruction for English learners, including immigrant children and youth, to help them develop a high level of English proficiency and allow them to "meet the same challenging State academic standards that all children are expected to meet." *Id.* § 6812(2). To carry out those objectives, schools use funds to provide professional development focused on improving language instruction, *id.* § 6825(c), and enhancing language instruction by updating curriculum, providing tutoring and translation help, and engaging families in their children's learning, *id.* § 6825(d).

Title IV-A (20 U.S.C. §§ 7101–7165) (part of Title IV's "21st Century Schools" programs) funds activities to support academic enrichment programs falling within three categories:

> a.  Providing all students with access to a "well-rounded education," which encompasses activities such as providing college and career counseling; improving instruction in science, technology, engineering, and mathematics;

providing accelerated learning programs; and offering foreign language instruction, *id.* §§ 7111, 7117;

b.  Improving school conditions to support "safe and healthy students," including by offering drug and violence prevention programs, mental and physical health services, preventing bullying and harassment, and providing high quality training to school personnel on classroom management and violence prevention, *id.* §§ 7111, 7118; and

c.  Supporting the "effective use of technology" by providing educators with the tools and professional development to allow them to effectively use technology in the classroom, building technological infrastructure, and helping students in rural and other underserved areas take advantage of digital resources and online courses, *id.* §§ 7111, 7119.

**C.  Each State Has an Approved Consolidated Plan and is Eligible for Funding**

To be eligible for funding under the ESEA's Formula Fund programs, Congress requires only that states have an approved state plan. *See id.* §§ 6396, 6611(d), 6823, 7113(c), 7173. Each ESEA Title delineates specific requirements that must be included in the state's plans in areas such as standards, assessments, and accountability systems. While each Title has its own requirements for state plans, to simplify a time-intensive process and in recognition of the interconnectivity of ESEA's formula fund programs, Congress permits states to submit a single, consolidated plan for ESEA programs. *See* 20 U.S.C. §§ 7842 (permitting consolidated plans for "covered programs"), 7801(11) (defining "covered program" to include "each of the programs authorized by" Parts I-A, I-C, I-D, II-A, III-A, IV-A, IV-B, and V-B(2) of the ESEA). The Department must review and generally must approve each state plan; the Secretary may disapprove a plan only after notice and an opportunity to amend and be heard. *Id.* § 7871. In reviewing plans, the Secretary has little discretion. Indeed, the statute prohibits disapproving a state plan based on the "nature of the activities proposed . . . if such proposed activities meet the applicable program requirements." *Id.* § 7871(c).

By 2018 every state had an approved consolidated plan covering the Formula Grant Programs under all Titles of the ESEA. Revised State Template for Consolidated Plan, U.S. Dep't of Educ. (Mar. 2017) (Ex. 18); NCSL, *Every Student Succeeds Act: Information and Resources* (Sep. 27, 2018), *available at* https://perma.cc/8JYB-MV82.

**D. Congress Has Consistently Funded the Formula Grant Programs**

Since enacting the ESEA in 1965, Congress has consistently appropriated funds for the Formula Grant Programs. In 2024, Congress appropriated billions of dollars to the Department of Education for these programs. *See* Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, div. D, tit. III, 138 Stat. 460, 681-93 (Mar. 23, 2024).

For example, Congress appropriated $19,107,790,000 for the education of disadvantaged children, including for "carrying out title I" of ESEA, for academic year 2024-2025. *Id.* at 682. Title I of ESEA mandates several formula grant programs, including (in Title I-C) programs for the education of migratory children. *See* 20 U.S.C. §§ 6391-6399.

The 2024 Appropriations Act likewise appropriated funds for the Formula Grant Programs under Title II-A, Title III-A, Title IV-A, and Title IV-B. Under the heading of "School Improvement Programs," Congress appropriated a total of $5,776,178,000 for these and other programs. 138 Stat. at 682. Within that aggregate total, Congress appropriated:

    a.    $890,000,000 "[f]or carrying out part A of title III of the ESEA", *id.* at 684 (English Language Acquisition);

    b.    $1,380,000,000 "for grants under subpart 1 of part A of title IV", *id.* at 683 (academic enrichment and student support) for academic year 2024-2025;

    c.    $1,329,673,000 "for part B of title IV" of ESEA for academic year 2024-25, *id.* (the 21st Century Community Learning Centers program).

For the appropriations for each of the Formula Grant Programs, Congress specified that the funds (or some portion of them) "shall become available on July 1, 2024." *Id.* at 682. For

example, Congress provided that of the $19 billion appropriated for the education of disadvantaged children under Title I, $8 billion "shall become available on July 1, 2024" and "shall remain available through September 30, 2025." *Id.*; *see also id.* (specifying that $3,947,312,000 for school improvement programs under Titles II-A, IV-A-1, and IV-B "shall become available on July 1, 2024"); *id.* at 684 (English language acquisition funds under Title III "shall become available on July 1, 2024").

On March 15, 2025, Congress enacted a continuing resolution that re-appropriated all of the funds referenced above, on the same terms and conditions as in the 2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101-08, 139 Stat. 9, 10-12 (Mar. 15, 2025) (the "2025 Continuing Resolution"). Thus, Congress re-appropriated the same amounts to each of the Formula Grant Programs referenced above and provided that the same amounts "shall become available" on July 1, 2025 for academic year 2025-2026 as was the case for the prior year.

Since at least 2017, congressional funding for these grant programs has remained relatively stable (or increased), allowing states and localities to rely on such funding in planning for the upcoming school year.[1]

For each of the Formula Grant Programs, the ESEA specifies that the Secretary "shall" use the appropriated funds to make grants to the states. Specifically, for Title I-C funds (education of migratory children), Congress directed that the Secretary "shall make grants to State educational agencies . . . to establish or improve, directly or through local operating agencies, programs for education for migratory children." 20 U.S.C. § 6392. The statute then sets

---

[1] *See* Rebecca R. Skinner, Cong. Rsch. Serv., R45977, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): A Primer* at 25-27 (Table 1) (2024).

forth a formula specifying the amount that each state "is entitled to receive," based in part on each state's number of migratory children and youth ages 3-21. *Id.* § 6393(a).

For Title II-A funds (teacher development), Congress directed that "the Secretary shall allot funds" to each state based on student population and poverty counts. 20 U.S.C. § 6611(b)(3); *id.* § 6611(b)(2)(A)(iv). The ESEA contains similar mandatory "shall" language for each of the other grant programs. *See* 20 U.S.C. § 6821(a), (c) (for Title III-A funds, Secretary "shall make a grant" and "shall allot" to state educational agencies); *id.* § 7113(b) (for Title IV-A funds, Secretary "shall allot" funds to each state); *id.* § 7172(b) (same for Title IV-B funds).

Congress likewise delineated how amounts appropriated for these programs should be provided to LEAs. In most cases, states must pass down funds to LEAs according to a statutory formula. For example, for the Title II-A program, Congress provided that states "shall" use at least 95% of their allotments "to make subgrants to local educational agencies" based on a statutory allocation formula. 20 U.S.C. §§ 6611(c)(1), 6612; *see also id.* §§ 6821, 6824, 6825, 7011(3) (for Title III-A program, states must "expend at least" 95% of their allotment to award subgrants to LEAs); *id.* § 7115(a)(1) (for Title IV-A program, states "shall allocate to each local educational agency in the State that has an application approved by the State educational agency"); *id.* §§ 7172(c)(1); 7174(a) (for Title IV-B program, states "shall reserve not less than 93 percent of the amount allotted to" them to award subgrants to eligible community learning centers on a competitive basis).

## E. Congress Forward-Funds Appropriations for ESEA Grants to Allow for Timely Awards

Congress has recognized the need to give state and local education officials adequate notice of the financial assistance they will receive to "carry[] out ongoing educational activities and projects." *See* 20 U.S.C. § 1223(a). To that end, Congress appropriates funds for the Formula

Grant Programs one fiscal year in advance of any given school year, and makes a significant portion of the appropriations available for use for the upcoming school year on July 1. The process of making funds available on July 1 is known as "forward funding." Forward funding gives school officials "time . . . to develop budgets in advance of the beginning of the school year," aligning the federal appropriation with schools' July 1 to June 30 budget year.[2] Consistent with this practice, in the 2025 Continuing Resolution, Congress appropriated billions of dollars for the Formula Grant Programs to become available on July 1, 2025, for the following academic year (2025-2026).

### F. The Department Historically Obligates Formula Funds on July 1 of Each Year

For decades, the Department has carried out Congress' directive to make funds available in time for states and LEAs to plan for the upcoming school year. Declaration of Mary Wall (Wall Decl.) (Ex.14) ¶¶ 13, 18. To do this, the Department has developed its own systems and processes to ensure that it can obligate funds on July 1 of each year.

The Department's policy and practice has long been for program offices to begin developing preliminary allocations for each state for each formula grant shortly after appropriations are finalized for the upcoming fiscal year. Wall Decl. ¶ 16. The draft allocations are then shared with Congress and with states so that states and LEAs can plan ahead. Wall Decl. ¶ 16; *see also, e.g.*, Declaration of Jharett Bryantt (Bryantt Decl.) (Ex. 1) ¶ 14 (Department typically provides draft funding allocations in the spring, well ahead of the next academic year). On July 1, the Department promptly makes funds available to states which, in turn, make funds available to LEAs and other grant recipients. Wall Decl. ¶ 18. This practice is so central to the

---

[2] Rebecca R. Skinner and Isobel Sorenson, Cong. Rsch. Serv., R48165, *The Elementary and Secondary Education Act (ESEA), as Amended by the Every Student Succeeds Act (ESSA): An Analytical Review of the Allocation Formulas*, at 70 (2004) (citing Gov't Accountability Office, *A Glossary of Terms Used in the Federal Budget Process*, GAO-050-734SP, at 56 (Sept. 2005)).

implementation of the Formula Grant Programs prescribed by Congress that the Department has incorporated it into its own evaluations of states, "identifying July 1 of each year for the upcoming school year as the standard date for Federal disbursement." Wall Decl. ¶ 14 (citations omitted).

### G. Defendants Fail to Make Appropriated Funds Available

Throughout the Spring of 2025, Defendants were noticeably silent regarding the amount states could expect under the Formula Grant Programs. Wall Decl. ¶ 19 (noting that the Department released allocations for some but not all Title programs).[3] On May 30, 2025, the Trump Administration announced its budget for 2026, which did not include any funding for these programs. *Id.* Nevertheless, the Department represented as recently as June 13, 2025, that it was working on allocations for the remaining Formula Grant Funds. Mot. for Prelim. Inj., Ex. 3, (Roberson Decl. (Cal.) ¶ 24 & Att. G, *California v. McMahon*, No. 1:25-cv-00329 (D.R.I. July 14, 2025) ("State PI"); *id.* Ex. 8 (Sanders Decl. (Ill.)) ¶ 17 & Att. A. That representation was short lived, when on June 30, 2025, the Department notified the states and Congress that:

> Given the change in Administrations, the Department is reviewing the FY 2025 funding for the [Title I-C, II-A, III-A, IV-A, IV-B] grant program(s), and decisions have not yet been made concerning submissions and awards for this upcoming academic year. Accordingly, the Department will not be issuing Grant Award Notifications obligating funds for these programs on July 1 prior to completing that review. The Department remains committed to ensuring taxpayer resources are spent in accordance with the President's priorities and the Department's statutory responsibilities.

State PI, Ex. 3 (Roberson Decl. (Cal.)) ¶ 25 & Atts. H, I, J, K, and L ("State PI Ex. 3 Atts., Withdrawal Email"). Notably, the Department provided no timeline regarding when, or if, the funds will be released.

---

[3] *See also* Mark Lieberman, *Trump's Education Budget Calls for Billions in Cuts, Major Policy Changes*, Educ. Week (May 30, 2025), https://perma.cc/J62D-JP5N.

When asked by the press about the withheld funds following the announcement, a Department spokesperson referred those questions to OMB.[4] An OMB spokesman claimed "no decisions have been made on whether to release, cut, or rescind the funds," and called the decision "an ongoing programmatic review" to ensure that the grants reflect President Trump's priorities. *Id.* The spokesperson further stated that "[i]nitial findings show that many of these grants programs have been grossly misused to subsidize a radical left-wing agenda." *Id.* In support of that contention he claimed: that some New York public schools had used funds designated for English-language learning to promote "illegal immigrant advocacy organizations," 2) that funds had been used to steer undocumented immigrants towards "scholarships intended for American students," and 3) that school improvement funds were used for a seminar on "queer resistance in the arts." *Id.* The spokesperson did not provide any information as to whether these examples ran afoul of ESEA statutory requirements, or what amount of funding out of the $6.8 billion was implicated by the three examples.

There was an uproar following the withholding determination. Multiple members of Congress wrote letters to urging the release of the funds, including a coalition of 32 Democratic senators,[5] 150 House members,[6] ten republican Senators,[7] representatives from Michigan,[8] and a republican congressman from New York.[9] On July 14, more than twenty states sued and moved

---

[4] Susan Crabtree, *OMB: States Used Education Grants for 'Left Wing Agenda'*, Real Clear Politics (July 5, 2025), https://perma.cc/4KS2-A296.

[5] Letter from Senators to Linda McMahon, Sec'y of Educ., and Russell Vought, Dir. of Off. of Mgmt. and Budget (July 10, 2025), https://perma.cc/VF8N-7SSE.

[6] Letter from Congress Members to Linda McMahon, Sec'y of Educ., and Russell Vought, Dir. of Off. of Mgmt. and Budget (July 10, 2025), https://perma.cc/YM3T-VFUE.

[7] Letter from Senators to Russell Vought, Dir. of the Off. of Mgmt. and Budget (July 16, 2025), https://perma.cc/AA2N-JTQ6.

[8] Letter from Congress Members to Linda McMahon, Sec'y of Educ. (July 7, 2025), https://perma.cc/7WQY-Y8XN.

[9] Letter from Michael V. Lawler, Member of Congress, to Donald J. Trump, President of the United States (July 9, 2025), https://perma.cc/FCW6-2LRU.

for a preliminary injunction to release the funding. Complaint, *California v. McMahon*, No. 1:25-cv-00329 (D.R.I. July 14, 2025); State PI. On July 17, a coalition of 600 nonpartisan local, state, and national organizations sent a letter urging the Department and OMB to release funds, noting that the withholding has been "catastrophic for on-going education programming."[10]

In the midst of the fallout, neither the Department of Education nor OMB issued any formal statement, leaving recipients without any information on the purported "review," what it entailed, and when it would be finished. Rather, pertinent information came out informally. On July 17, OMB Director Vought said at a *Christian Science Monitor* breakfast that Defendants were considering sending a second 2025 rescission proposal to Congress pursuant to the Impoundment Control Act to claw back additional funds that Congress had appropriated.[11]

### H. Plaintiffs Are Harmed by the Department's Failure to Make Appropriated Funds Available As Required

The Department's abrupt decision to withhold the Formula Grant funds at the eleventh hour has caused chaos and confusion in school districts across the country. For months, districts have been budgeting and planning their programming and staffing for the upcoming school year in reliance on the Department's releasing the funds on July 1, as it has done for decades. Bryantt Decl. ¶¶ 12, 17, 20 ("The timeliness and predictability of this process are critical to the financial stability of our ESEA-funded activities and staff.); Declaration of Michael Gustin (Gustin Decl.) (Ex. 2) ¶¶ 11-21; Declaration of Luke Meinert (Meinert Decl.) (Ex. 4) ¶¶ 12-21; Declaration of Madeline Aguillard (Aguillard Decl.) (Ex. 5) ¶¶ 15-25. With the funds now withheld, school districts have had to cancel programming, fire teachers, and repurpose funds to try and make up

---

[10] Letter from 600 organizations to Linda McMahon, Sec'y of Educ., and Russell Vought, Dir. of Off. of Mgmt. and Budget (July 17, 2025), https://perma.cc/GF4C-9RS3.

[11] Brett Samuels, *White House likely to send another rescissions package to Congress*, The Hill (July 17, 2025), https://perma.cc/H9WR-K6J7.

the shortfall as best they can. *See, e.g.*, Bryantt Decl. ¶¶ 26-29 (Anchorage has already notified personnel working with English learners that their positions have been eliminated and reallocated funds); Gustin Decl. ¶ 31; Declaration of Dr. Alesia Smith (Smith Decl.) (Ex. 3) ¶¶ 16, 19, 21-22, 25-16; Meinert Decl. ¶¶ 27-32; Aguillard Decl. ¶¶ 23, 30-31, 35. Every day that passes with the funds still in limbo exacerbates the irreparable harm that these districts face, as teachers are laid off due to budget shortfalls and look for job opportunities elsewhere. Bryantt Decl. ¶¶ 28-30; Smith Decl. ¶ 35; Meinert Decl. ¶¶ 25-26; Aguillard Decl. ¶ 36. Schools are also having to cut summer programs *now* because they lack the funds they expected, depriving students of important summer enrichment programs before the school year starts in a matter of weeks. Aguillard Decl. ¶¶ 23, 30.

The Teachers Union Plaintiffs and their members face irreparable harm each day that the Department is allowed to withhold the funds. The Teachers Unions represent hundreds of thousands of teachers and other educational professionals across the country, some of whom were to be paid with ESEA withheld funds and have already been laid off due to the unexpected shortfall in funding, *see* Declaration of Maribeth Calabro (Calabro Decl.) (Ex. 11) ¶ 22, and others who will be terminated imminently if the Department's actions are allowed to stand, Declaration of Dan Montgomery (Montgomery Decl.) (Ex. 8) ¶ 14; Declaration of Jeffrey Freitas (Freitas Decl.) (Ex. 7) ¶ 17; Declaration of Wendy Coleman (Coleman Decl.) (Ex. 6) ¶ 15; Declaration of Zeph Capo (Capo Decl.) (Ex. 12) ¶ 8; Declaration of Peter Applebee (Applebee Decl.) (Ex. 9) ¶¶ 15, 18-19; Declaration of Melissa Cropper (Cropper Decl.) (Ex. 10) ¶¶ 10-11. These educators are also missing out on important, ESEA funded, summer training and mentorship programs that have been canceled due to lack of funding. Bryantt Decl. ¶ 27

14

(Anchorage has canceled educator training in July and August); Applebee Decl. ¶¶ 13-14; Calabro Decl. ¶ 21; Montgomery Decl. ¶ 10; Cropper Decl. ¶ 10.

Plaintiffs Florida PTA and its members are also experiencing irreparable harm from the Department's withholding. Florida PTA's members include parents with migratory children and their parents; teachers of English Language learners, their students, and those students' parents; and teachers, parents, and students in high-need schools, all of whom would benefit from the withheld funds. Declaration of Jude Bruno (Bruno Decl.) (Ex. 15) ¶¶ 8-21. And due to the refusal to release Formula Funds, Florida PTA itself will have to divert resources from its normal programming to support students and family engagement, to make up for the money not being released. *Id.* ¶ 25.

Finally, Plaintiff P.S. 305, a nonprofit educational advocacy organization in Miami-Dade, Florida, will need to scrap its strategic plan for the upcoming school year and redirect its efforts to helping parents and students affected by the recent cuts, preventing it from doing the advocacy and leadership-development work it had planned to do if the Department released the funds as expected. Declaration of Mina Hosseini (Hosseini Decl.) (Ex. 16) ¶¶ 13-16.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). Irreparable injury operates on "a sliding scale" such that "the greater the likelihood [of success], the less harm must be shown." *Soscia Holdings, LLC v. Rhode Island*, 684 F. Supp. 3d 47, 49

(D.R.I. 2023) (citing *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010)).

For APA claims, 5 U.S.C. § 705 also authorizes courts to "issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. "[C]ourts use the same standard to decide" requests for relief under § 705 "as for preliminary injunction determinations." *N.H. Hosp. Ass'n v. Burwell*, No. 1:15-cv-00460, 2016 WL 1048023, at *5 n.6 (D.N.H. Mar. 11, 2016). And 5 U.S.C. § 706(2) likewise authorizes this Court to "preliminarily 'set aside'" agency action. *See Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *19 (U.S. June 27, 2025) (Kavanaugh, J., concurring) (citing *West Virginia v. EPA*, 577 U.S. 1126 (2016) and *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826–843 (2024) (Kavanaugh, J. concurring)).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are overwhelmingly likely to succeed on the merits of their claims. Defendants' actions are arbitrary, capricious, unreasonable, contrary to statute, and unconstitutional.

Defendants' new policy changes to conduct a review but not release the Formula Funds on July 1, and the resulting withholding of funds, are final agency actions subject to review under the APA. They are arbitrary and capricious for multiple independent reasons, including that Defendants failed to provide any reasoned explanations for their actions, relied on improper considerations not permitted under the statutes, did not even acknowledge that they were changing longstanding policies, and neglected the serious reliance interests at stake.

Defendants' actions are also contrary to the governing statutes. They violate the ESEA, which imposes non-discretionary duties on the Secretary to allot particular amounts to each state

16

based on mathematical formulas, not current political priorities. Defendants also violated the 2025 Continuing Resolution appropriating funds for the Formula Grant Programs. Under the 2025 Continuing Resolution and a provision of the Impoundment Control Act known as the "Fourth Disclaimer," Defendants may not intentionally withhold the appropriations for any period of time beyond July 1.

Moreover, Defendants' actions violate the constitutional separation of powers: the Executive Branch cannot refuse to comply with congressional mandates, including mandates to spend appropriated funds for particular purposes. Nor can Defendants impose conditions beyond those required by Congress. That is another reason Plaintiffs are likely to succeed on their claims Defendants' actions violate the APA, as well as their independent claims under the Constitution itself.

Because Congress has mandated the Department spend the funds, Defendants have also unlawfully withheld required action under 5 U.S.C. § 706(1). And because no statute authorizes Defendants to refrain from obligating the Formula Funds to states, Plaintiffs are also likely to succeed on their claim that Defendants' actions are *ultra vires*.

## A. Defendants' Actions Violate the Administrative Procedure Act

### 1. Defendants' New Policies Not to Allot or Apportion Funds by July 1, Pending a Policy Review, Are Final Agency Actions

Defendants' actions constitute "final agency action" subject to judicial review. 5 U.S.C. § 704. An agency action is "final" when it (1) represents "the consummation of the agency's decisionmaking process," and (2) conclusively determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotations omitted). Courts have called for a "pragmatic" approach in analyzing finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600

17

(2016); *see also Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (holding agency memoranda were final agency action, noting that they "bound [agency] staff").

Here, the decision to not release the funds on July 1 marks the "consummation" of OMB's and the Departments' decisionmaking process as OMB and ED necessarily determined that they can and will withhold these formula funds beyond that date for a policy review. *Bennett*, 520 U.S. at 178. Specifically, the Department has adopted a new policy that it "will not be issuing Grant Award Notifications obligating funds for these programs on July 1," and will not be allotting the Formula Funds on July 1, "prior to completing [a] review" to ensure the funds "are spent in accordance with the President's priorities." State PI Ex. 3 Atts., Withdrawal Email. OMB has also apparently adopted a new policy to not apportion the Formula Fund appropriations to the Department by July 1, 2025.[12]

These new policies mark a reversal of decades-long practice and are in conflict with statutory requirements. That the Department and OMB maintain "no decisions" have been made on whether the funds will eventually be released does not defeat finality. The decision to not timely release the Formula Funds on July 1, contrary to longstanding practice and legal requirements, "is not itself subject to further consideration by the agency," regardless of "the potential for a different . . . decision" on releasing the funds later. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020); *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025) (appeal pending) (funding

---

[12] It has also been rumored that the administration will submit a request to Congress to rescind the Formula Funds (which would not be lawful as described *infra*), and will continue to withhold the funds while that request is pending. *See* Samuels, *White House likely to send another rescissions package to Congress*, https://perma.cc/H9WR-K6J7. If that happens, ED will again have adopted a policy to not timely award and allot funds until the completion of an unauthorized discretionary policy "review."

freeze decision was final where "there are no further steps the agencies need to take to determine whether they will freeze that funding.").

The results of Defendants' decisions have plain "legal consequences": the states do not receive grants and allotments of federal funds, and LEAs do not receive subgrants for the large percentage of the Formula Funds that the states must pass down to them. "[L]egal consequences' surely flow" where "grant recipients cannot access previously awarded funds." *Woonasquatucket*, 2025 WL 1116157, at *15; *see also Nat'l Council of Nonprofits v. OMB,* 775 F.Supp.3d 100, 123–124 (D.D.C. 2025) (indefinite freeze in funding was final agency action); *New York v. Trump*, 769 F.Supp.3d 119, 136-37 (D.R.I. 2025) (appeal pending) (same); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting more than a dozen cases where temporary pauses constituted final agency action for APA purposes).

### 2. Defendants' Actions Are Arbitrary and Capricious and An Abuse of Discretion

An agency action must be "reasonable and reasonably explained," otherwise it is arbitrary or capricious under 5 U.S.C. §706(2) if it is not. *Ohio v. EPA*, 603 U.S. 279, 292 (2024). Defendants' actions here are neither reasonable nor reasonably explained.

### a) Defendants' Actions Are Substantively Unreasonable

Defendants' actions to withhold the Formula Funds beyond July 1—seemingly for no reason other than ideological disagreement with how some funds are used —is "substantively unreasonable in violation of the APA." *New York*, 769 F.Supp.3d at 141 (citing *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (distinguishing between claims that agency action "was substantively unreasonable" and claims that "the agency has failed to adequately address all of the relevant factors or to adequately explain its [decision]"); *see also Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 125.

Defendants' review process is substantively unreasonable because there is simply nothing to "review" relevant to the decision to release the funds, and there certainly is no legitimate reason to conduct a review for consistency with the President's policy priorities. Here, as in *New York*, Congress "appropriated funds to certain programs and funding streams that mandated expenditures based on fixed formulas—*not* the contravening policies of the President." *New York*, 769 F. Supp. 3d at 141. The Formula Grant Programs are governed by "statutory commands that did not give discretion to withhold funds based on the policy initiatives the Executive sought to further." *Id.* Where Congress has appropriated money for the Formula Grant Program, and prescribed the amount that each state must receive down to the penny, withholding the Formula Funds for any period of time for policy reasons is substantively unreasonable.

### b)   Defendants Did Not Provide a Reasoned Explanation

Defendants' actions are independently arbitrary and capricious because they do not reflect "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). Defendants' actions do not reflect reasoned decisionmaking for at least four different reasons, each of which suffices to enjoin the actions.

*First*, Defendants flunk the most "fundamental requirement of administrative law," which "is that an agency set forth its reasons for decision." *Massachusetts v. NIH*, No. 1:25-cv-10388, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025) (brackets and quotation marks omitted). The Department offered no explanation at all for its decision not to release funds on July 1, stating only that it was conducting a "review . . . to ensure[] taxpayer resources are spent in accordance with the President's priorities and the Department's statutory responsibilities." State PI Ex. 3 Atts., Withdrawal Email. The Department provided no facts or evidence in support of this decision, let alone a "rational connection between the facts found and the choice made," *Ohio*,

603 U.S. at 292. For its part, OMB asserted that "many of these grant programs" were "misused

to subsidize a radical left-wing agenda," without any evidence to support this assertion and with

no explanation why the purported ideological valence of how the funds are used justifies

withholding them under the relevant statutes.[13] "[C]onclusory statements will not do under the

APA." *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). "[A]n agency's

statement must be one of reasoning," *id.*, and neither the Department nor OMB provided any

reasoning here.

　　*Second*, Defendants "relied on improper factors" and "failed to consider pertinent aspects

of the problem." *United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 30 (1st Cir. 2011).

Congress made only two factors relevant to whether Defendants obligate the Formula Funds to

states: (1) whether a state has an approved plan for the relevant Formula Grant Program; (2)

whether Congress has appropriated funds for that program. *See* 20 U.S.C. § 6821(a); *id.* §

7172(b)(1). Both factors were met here on July 1, 2025, and no others were pertinent. Congress

assigned Defendants a ministerial duty to provide the Formula Funds; it did not allow them to

consider whether states with approved plans use those funds in furtherance of the President's

policy agenda.

　　*Third*, neither the Department nor OMB "display[ed] awareness that it *is* changing

position," and they certainly did not "show that there are good reasons for the new policy." *FCC

v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Since at least 1976, the Department

has implemented the "forward funding" scheme to issue grant awards to the States and make

funds available on or about July 1.[14] As Mary Cassell, who spent 30 years as a civil servant at

---

[13] Crabtree, *OMB: States Used Education Grants for 'Left Wing Agenda'*, https://perma.cc/4KS2-A296.

[14] *See* Cong. Rsch. Serv., R43482, *Advance Appropriations, Forward Funding, and Advance Funding: Concepts,
Practice, and Budget Process Considerations* at 7 (June 10, 2019) (citing Peat, Marwick, Mitchell & Co., *A Study of
Late Funding of Elementary and Secondary Education Programs*, prepared for the U.S. Office of Educ. (Feb. 1976),

the Department and OMB, attests in her declaration: "Across my entire career, I was not aware of any discussion that ever took place to consider not providing the formula funds to states as soon as they became available on July 1." Declaration of Mary Cassell (Cassell Decl.) (Ex. 13) ¶ 10. Indeed, the Department has confirmed this longstanding policy in memoranda, public statements, budget requests, and their consistent actions to make the first tranche of funds for an academic year available on or about July 1. *See* Ex. 18; Ohio Consolidated State Performance Report Part 1 2021-2022 at 46 (June 16, 2023) (Ex. 19); U.S. Dep't of Educ., Title II, Part A of the Elementary and Secondary Education Act of 1965: Supporting Effective Instruction State Grants (Jan. 2025) at 13 (Ex. 20); U.S. Dep't of Educ., Nita M. Lowey 21st Century Community Learning Centers Program Title IV, Part B of the Elementary and Secondary Education Act of 1965, Non-Regulatory Guidance (Jan. 2024) at 9 (Ex. 21). Likewise, OMB has consistently apportioned the full amount of ESEA "forward funding" prior to July 1. *See* Cassell Decl. ¶¶ 8-9. Yet in announcing their new policies, Defendants did not even acknowledge their dramatic break from their longstanding policies. The failure to do so violates the APA.

*Fourth*, Defendants failed to address the "serious reliance interests" of states, school districts, teachers, students, and others that have depended on Defendants' longstanding policy to make funds available starting on July 1. "When an agency changes course, . . . it must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents*, 591 U.S. at 30 (quotations omitted). Defendants' statements here are devoid of any considerations of the serious reliance interests engendered by Defendants' prior, decades-long policy for releasing Formula Funds on July 1. *See, e.g.*, Wall Decl. ¶ 18; Gustin Decl. ¶¶ 11-21 (explaining how critical it is for the Cincinnati School Districts' budget

---

at VI-1); *see also* Cong. Rsch. Serv., R44477, *Department of Education Funding: Key Concepts and FAQ*, at 10 (Feb. 19, 2019).

and planning process that the Department follow a timely and predictable process for making funds available for school districts by the start of the their fiscal year on July 1); Bryantt Decl. ¶¶ 11-20 (same); Meinert Decl. ¶¶ 10-19 (same); Aguillard Decl. ¶¶ 15-25; *see also* Aguillard Decl. ¶¶ 23, 31 (outlining logistically complex plans and necessary purchases that had already been set in motion to provide services to students in remote communities immediately after the start of the budget year on July 1); Cassell Decl. ¶ 10. "In light of the serious reliance interests at stake," it was unlawful that the agency "gave almost no reasons at all." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

### 3. Defendants' Actions are Contrary to Statutes

Defendants' policies and actions violate a host of statutes, including the provisions of ESEA prescribing the Formula Grant Programs. Those provisions impose mandatory, ministerial duties on Defendants to award formula grants and allot precise sums of money to each state. Each of the relevant titles provides that "the Secretary shall allot" to each SEA particular amounts determined by mathematical formulas, and/or "shall make a grant" to each SEA in those amounts. 20 U.S.C. §§ 6392, 6393(a) (Title I-C); 6611(2)(A)(iv), (3) (Title II-A); 6821(c)(2)(A) (Title III-A); 7113(b)(1)(A) (Title IV-A).

As noted, there are only two preconditions to Defendants taking these actions: (1) the state must have an approved plan for each program; and (2) Congress must have appropriated funds for each program for the relevant fiscal year. *See, e.g.*, *id.* § 6821(a) ("In the case of each State educational agency having a plan approved by the Secretary for a fiscal year," "the Secretary shall make a grant for the year to the agency" in specific allotments); *id.* § 7172(b)(1) ("the Secretary shall allot to each State for the fiscal year an amount" determined by a statutory

formula). Both preconditions were indisputably met as of July 1, leaving Defendants only with the ministerial duty to obligate the funds in the proper amounts once they became available.

The statutes thus afford Defendants no discretion over whether to obligate the funds to reach SEA, and certainly no discretion to withhold funds from States with approved plans in service of a "policy review." No review could lawfully alter or impact the obligation and distributions of funds that Defendants must make. Defendants' decisions to not allot funds and make grants on July 1, because Defendants are undertaking a policy review, violates the ESEA provisions prescribing the Formula Grant Programs.

Supreme Court precedent confirms that Defendants have a non-discretionary duty to allot the full amounts that the Secretary "shall allot" under the statutes. In *Train v. City of New York*, the Supreme Court addressed a statute providing that specific sums "shall be allotted" by the Environmental Protection Act (EPA) for particular fiscal years. 420 U.S. 35, 39 (1975). The Court held that the statutes did not "confer any discretion on the Execution to withhold from this program at the allotment stage." *Id.* at 44. The Court affirmed the district court's order that EPA had to make the required allotment. *Id.* at 40. In a companion case decided the same day, the Supreme Court reversed a D.C. Circuit decision involving the same statute, where the D.C. Circuit had "proceeded on the premise that there was discretion to *control or delay allotments*." *Train v. Campaign Clean Water, Inc.*, 420 U.S. 136, 138 (1975) (emphasis added). The Supreme Court held that "the premise underlying the judgment of the Court of Appeals" was "at odds" with the holding of *City of New York*, and therefore vacated and remanded. These Supreme Court decisions are on all-fours here, and Defendants do not have "any discretion" to "withhold" or "control or delay" the allotments of the Formula Funds. *Campaign Clean Water,* 420 U.S. at 138, 44.

24

Defendants' withholding of Formula Fund grants and allotments also violates the 2025 Continuing Resolution, taken in conjunction with the statutes prescribing the Formula Grant Programs and the Impoundment Control Act (ICA). When Congress exercises its constitutional power of the purse to enact appropriations, the default rule is that an agency may not intentionally defer spending the funds. *See Aids Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 143-48 (D.D.C. 2025). In the ICA, Congress prescribed the exclusive circumstances where an agency *is* permitted to refrain from spending appropriations. As the Government Accountability Office (GAO) has explained, the ICA incorporates into law "the premise that when Congress appropriates money to the executive branch, . . . an agency must make funds available for obligation unless otherwise authorized [by the ICA] to withhold." GAO, B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017); *see* GAO, B-203057, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981).

The ICA broadly defines "deferrals" for which this rule applies, and it does not permit *any* deferrals of appropriations for formula funds like those here. The ICA defines a "deferral" as any "withholding or delaying the obligation or expenditure of" funds, and "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" funds. 2 U.S.C. § 682(1). For most appropriations, the ICA sets forth three circumstances where an agency may defer funds. *See id.* § 684(b). However, an ICA provision known as the "Fourth Disclaimer" provides that "[n]othing contained in this Act . . . shall be construed as superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." *See id.* § 681(4). Courts and GAO have interpreted the Fourth Disclaimer to prohibit any deferrals—for any amount of time for any reason—of appropriations that Congress mandated be obligated to particular recipients in particular amounts, such as through formula

funding. *See State of Me. v. Goldschmidt*, 494 F. Supp. 93, 98 (D. Me. 1980); *Dabney v. Reagan*, 542 F. Supp. 756, 767 n.3 (S.D.N.Y. 1982); *see also City of New York v. Clinton*, 985 F. Supp. 168, 170 (D.D.C. 1998) ("The ICA authorized the President to defer spending of Congressional appropriations during the course of a fiscal year . . . as long as Congress intended for those appropriations to be permissive rather than mandatory.").

Three GAO decisions are illustrative. In B-337137, GAO evaluated the current Administration's pause on new obligations under the National Electric Vehicle Infrastructure (NEVI) Formula Program. GAO, B-337137, 2025 WL 1521234, at *5 (Comp. Gen. May 22, 2025). GAO explained that the Fourth Disclaimer applies to these funds and therefore precludes withholding because, among other things, the statute "prescribes a formula by which . . . funds are to be allocated" and "uses language mandating the allocation of funds to states or territories." *Id.* at *10. Because the Fourth Disclaimer applies, "NEVI Formula Program funds cannot be deferred," full stop. *Id*. GAO described a similar prior decision in which it found the Fourth Disclaimer applied where a law "required that funds be allotted to states by a specific formula in the Act," "states had to submit plans for approval before receiving the funds," and the law "specifically mandated the [agency] pay amounts to states." *Id*. All of those factors are present here. And GAO recently confirmed, just a month ago, that the Fourth Disclaimer prohibits any withholding of grants to states that Congress mandated be made pursuant to "an allotment formula." GAO, B-337375, 2025 WL 1714233, at *8 (Comp. Gen. June 16, 2025). GAO found that the agency there had effectuated an unlawful "withholding [of] funds that were not eligible for withholding *under any circumstance*." *Id.* at *2 (emphasis added).

The Formula Funds appropriated by the 2025 Continuing Resolution, and required to be obligated to states pursuant to specific statutory formulas, likewise fall under the Fourth

Disclaim and are "not eligible for withholding under any circumstances." *Id.* That means the Department may not intentionally defer the obligation of the Formula Funds to SEAs for any period of time for any reason. Accordingly, the funds had to be obligated as soon as they became available on July 1, 2025.

To the extent OMB has contributed to the violations of the above statutes by not apportioning the Formula Funds to the Department prior to July 1, 2025, OMB is violating all of those statutes as well. Moreover, any OMB policy of not apportioning the Formula Funds violates the Anti-Deficiency Act. The President has delegated apportionment authority to the OMB Director, and the Act requires OMB to apportion appropriations to agencies not later than "30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2)(B); *see* Cassell Decl.¶ 7. OMB violated that requirement to the extent it did not apportion the Formula Funds to the Department within 30 days of the passage of the 2025 Continuing Resolution on March 15, 2025.

OMB's non-apportionment policy for the Formula Funds also violates the Anti-Deficiency Act's provisions limiting when OMB may not apportion the full amounts appropriated, so as to establish a "reserve." *Id.* § 1512(c). In 1974, Congress amended the "reserve" provisions of the Anti-Deficiency Act specifically to "preclude the President from relying on the Act as authority for implementing policy impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987). Today, the Act limits establishing reserves to three narrow circumstances, none of which are met here. 31 U.S.C. §§ 1512(c)(1)(A)-(C).

### 4. Defendants' Actions Are Contrary to the Constitutional Separation of Powers

Under the APA, the Court must aside an agency action that is "contrary to [the] constitution[]." 5 U.S.C. § 706(2)(B). Here, Defendants' refusal to spend appropriated funds

27

because of policy disagreements with Congress violates the constitutional separation of powers. As court after court has recognized, the Constitution "exclusively grants the power of the purse to Congress, not the President." *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226, at *18 (D.R.I. May 16, 2025) (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018)). The Spending Clause provides that "Congress shall have Power To" distribute funds in order to "provide for the general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. And the Appropriations Clause forbids the expenditure of funds except "in Consequence of Appropriations made by Law." *Id.* § 9. By reserving such powers for Congress alone, these clauses construct a "bulwark of the Constitution's separation of powers among the three branches of government." The Federalist No. 28, at 359 (James Madison) (Clinton Rossiter, ed., 1961).

As already noted, Defendants are withholding approximately $5.5 billion of appropriated Formula Grant Funds while they conduct a review to ensure that the funds "are spent in accordance with the President's priorities," rather than a "radical leftwing agenda." This rationale is entirely divorced from the ESEA and the relevant appropriations law, which collectively (1) mandate that Defendants disburse the funds to states that meet certain conditions and (2) provide no discretion to Defendants to withhold the funds for policy reasons. *Supra* 6-9, 23-25. Indeed, by approving each state's consolidated ESEA plan, the Department has already ensured that the funds will comply with all conditions required by Congress. *Supra* 23-24. Defendants' actions thus violate the separation of powers in two ways.

*First*, Defendants have refused to spend appropriated funds that Congress has mandated be disbursed to the states, and Defendants have violated their mandate to release the first tranche of funds on July 1. As then-Judge Kavanaugh held in *Aiken*, an agency's outright refusal to

28

comply with "statutory *mandates*" violates the separation of powers. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J) (emphasis in original). That applies equally to spending mandates: although the Executive Branch "sometimes has policy reasons for . . . wanting to spend less than the full amount appropriated by Congress for a particular project or program, . . . even the President does not have unilateral authority to refuse to spend the funds." *Id.* at 261 n.1. Indeed, the Supreme Court has specifically held that where a statute mandates that appropriated sums "shall be allotted"—as the ESEA does here—the Executive is "not permitt[ed]" to "allot . . . less than the entire amount[]" appropriated. *Train*, 420 U.S. at 42; *see also Kendall v. United States*, 37 U.S. 524, 610 (1838) (compelling Executive to pay a congressionally mandated award it had attempted to withhold). Defendants lack any constitutional authority to defy Congress' mandates here.

*Second*, Defendants have imposed conditions on the funds beyond those required by Congress. It is well-established that the Spending Clause authorizes "Congress [to] attach conditions on the receipt of federal funds" in order "to further broad policy objectives[.]" *City & Cnty. of S.F.*, 897 F.3d at 1232 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)). Because that power "ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare," *Tex. Educ. Agency v. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021), the ability to impose conditions "lies solely with the Legislative branch." *Colorado*, 2025 WL 1426226, at *19. "In contrast, the Executive's role is to 'take care that the laws be faithfully executed.'" *Id.* (quoting U.S. Const. art. II, § 3). The Executive thus "strikes at the heart of . . . the separation of powers" when it imposes "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [its own] policy objectives." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020); *see also New York*, 769 F. Supp. 3d. at 51

("The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'")

.

Here, Defendants are doing precisely what courts have prohibited. As outlined above, it is beyond dispute that the states have met all conditions required by Congress through the approval of their ESEA plans. *Supra* 6-7. Yet Defendants are currently withholding the funds in order to impose still other conditions—that is, a requirement that the funds further the "President's priorities." Courts have repeatedly found similar actions to violate the Spending Clause. For example, the Fifth Circuit struck down Department regulations where they imposed extra-statutory conditions on funding, explaining that "allowing the Executive to require" additional conditions "would grant the Executive a power of the purse." *Tex. Educ. Agency*, 992 F.3d at 362. *See also, e.g., Martin Luther King Jr., Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 1582368, at *6, 15-17 (W.D. Wash. June 3, 2025) (anti-DEI funding conditions violated separation of powers); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 441 (D. Md. 2025) (conditioning funding on recipients' denial of gender-affirming care violated separation of powers). Defendants have thus unconstitutionally "claimed for [themselves] Congress's exclusive spending power." *See City and Cnty. of S.F.*, 897 F.3d at 1234.

### 5.   Defendants Have Unlawfully Withheld or Unreasonably Delayed Agency Action

Setting aside Defendants' adoption of new policies that depart from their longstanding ones, the withholding of the Formula Funds—standing alone—constitutes agency action "unlawfully withheld." 5 U.S.C. § 706(1).

Section 706(1) provides that courts "shall compel agency action unlawfully withheld *or* unreasonably delayed." *Id.* (emphasis added). There is a "distinction between the two claims," *South Carolina v. United States*, 907 F.3d 742, 759 (4th Cir. 2018), and "[t]he distinction

between agency withholding and delay is important," *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1120–21 (9th Cir. 2025). "If an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so." *Id.* "But if an agency delays a required action, it violates § 706(1) only if the delay is unreasonable." *Id.* at 1121 (quotations omitted). "The reasonableness of any delay is a fact-intensive inquiry analyzed under 'the so-called *TRAC* factors.'" *Id.* (referring to *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) ("*TRAC*")); *see also Town of Wellesley v. Fed. Energy Reg. Comm'n*, 829 F.2d 275, 277 (1st Cir. 1987).

The Ninth Circuit in *Al Otro Lado* provided a helpful illustration of the distinction between withholdings and delays. "Consider someone who heads to the post office to mail a package shortly before the holidays." 138 F.4th at 1122. "The postal workers tell the person that they will not accept her package that day because they are very busy, but that she is welcome to come back the next day." *Id.* "They do not give her an appointment, and they warn her that tomorrow they are likely to be just as busy as today." *Id.* The postal workers have "withheld their services," not just "delayed them," even though they may eventually mail the package. *Id.*

Defendants' refusal to release the Formula Funds on July 1 likewise constitutes a withholding of the funds. Defendants have withheld the funds pending some unspecified review for an indefinite length of time, with no assurance that it will ever release the full amounts appropriated for these programs. Moreover, there is no basis to assess the "reasonableness" of the withholding, as must be done for actions delayed. *Id.* at 1121. Defendants have no discretion regarding the provision of funds for states with approved plans—they must allot funds to such states in precise amounts. The "unreasonably delayed" provision in § 706(1) injects discretion

into the district court's analysis by using reasonableness as its touchstone," but Defendants had no discretion here. *South Carolina*, 907 F.3d at 760.

In addition, agency inaction is properly reviewed withholding where the agency has a "statutory deadline" to take action. *Id.* Here, as already explained, the Department had a deadline of July 1 to release the Formula Funds. *Supra* 10-11. OMB also had a statutory deadline to apportion the funds within 30 days of the enactment of the 2025 Continuation Resolution. 31 U.S.C. § 1513(b)(2)(B). Defendants' failure to take these actions by those deadlines is unlawful, and this Court "shall compel agency action unlawfully withheld." 5 U.S.C. § 706(1).

Even if Defendants' refusal to release the Formula Funds were analyzed as actions unreasonably delayed, the delay here would be unreasonable under the *TRAC* factors. The first *TRAC* factor, which evaluates the time the agency is taking under a "rule of reason," is the "most important TRAC factor." *Novack v. Miller*, 727 F. Supp. 3d 70, 77 (D. Mass. 2024). "It looks to whether the agency's response time is governed by an identifiable rationale." *Id.* at 77–78 (quotations omitted). For the reasons previously explained why Defendants' actions are arbitrary and capricious, Defendants have not identified any reasonable rationale for their refusal to release the funds. *Supra* 19-23. The other *TRAC* factors point in the same direction. Congress "provided a timetable or other indication of the speed with which it expects the agency to proceed," here, July 1. *Ghannad-Rezaie v. Laitinen*, 757 F. Supp. 3d 148, 154 (D. Mass. 2024). The inaction here implicates "human health and welfare" and not "economic regulation." *Id.* There are no "higher priorities" that Defendants have identified, and "the nature and extent of the interests prejudiced by delay" are profound, *id.*, as schools, students, and teachers are already suffering the effect of Defendants' actions.

In short, no matter the rubric under which the Court evaluates Plaintiffs' § 706(1) claim, Defendants should be compelled to immediately release the Formula Funds.

**B. Defendants Are Violating the Constitution**

In addition to their claims under the APA, Plaintiffs bring freestanding constitutional claims for violations of the separation of powers. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The Supreme Court has repeatedly affirmed that this principle applies to separation of powers claims; that is, plaintiffs may bring freestanding constitutional claims for violations of "separation-of-powers principles." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)). Indeed, the Court has held that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

Here, Plaintiffs are likely to succeed on their freestanding constitutional claims for the same reasons that Defendants' actions are contrary to constitutional right for purposes of Plaintiffs' APA claims. *Supra* 27-30.

**C. Defendants' Actions Are *Ultra Vires***

Plaintiffs are also likely to succeed on their independent claim that Defendants' actions are *ultra vires*. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). An agency "literally has no power to act unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 576 U.S. 355, 374 (1986)). Any action that agency officials take outside the bounds of their statutory authority is *ultra vires* and subject to judicial review. *Id.*; *see also Nat'l*

*Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) ("Review for *ultra vires* acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law[,] and the courts generally have jurisdiction to grant relief." (cleaned up)).

Here, as explained, no statute gives Defendants authority to refrain from obligating the funds at issue—whether to conduct an alleged "policy review" or otherwise. Rather, the statutes impose clear, mandatory duties on Defendants to award formula grants to each State. *See, e.g.*, 20 U.S.C. § 6392 (Secretary "shall make grants to State educational agencies"); *id.* § 6611(b)(3) (Secretary "shall allot funds to each State"). Nor do any statutes authorize Defendants to impound the funds for policy reasons. Had Congress intended to give Defendants discretion to take such action of vast "economic and political significance," it would have said so expressly in the ESEA. *West Virginia v. EPA*, 597 U.S. 697, 703, 716 (2022) (agencies must identify "clear congressional authorization" for major questions affecting "billions of dollars of impact"). Its failure to do so underscores that Defendants have acted *ultra vires*. *See, e.g.*, *Aids Vaccine*, 770 F. Supp. 3d at 148 (defendants likely acted *ultra vires* by impounding billions of dollars in congressionally appropriated foreign aid, which was "no everyday exercise of federal power" (citation omitted)).

Accordingly, Defendants' actions are *ultra vires* and should be enjoined. *See Armstrong*, 575 U.S. at 326-27 (federal courts possess inherent equitable authority to enjoin federal officials for violations of federal law); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) ("[W]here [an] officer's powers are limited by statute, his actions beyond those limitations . . . are ultra vires . . . and therefore may be made the object of specific relief.").

**D. Defendants' Actions Are Unlawful Regardless of Whether the President Submits a Rescission Proposal for the Formula Funds, which Would Itself be Illegal**

If the President submits a proposal to Congress to rescind the Formula Funds pursuant to the ICA's procedures, *see* 2 U.S.C. § 683(a), that would have no bearing on Defendants' legal violations or mandates, because any such rescission proposal would be null and void in light of the Fourth Disclaimer. The ICA sets forth special procedures by which the President may propose to Congress to rescind unobligated appropriations. A rescission proposal sent to Congress pursuant to the ICA is treated differently from all other proposed legislation; it holds "privilege[d]" status and cannot be filibustered in the Senate, meaning it is subject to only a 50-vote threshold rather than the 60-vote threshold typically required for legislation. *See id.* § 688(b), (d).

However, because the relevant statutes "require[] the obligation of" the Formula Funds, *id.* § 681(4), they fall under the Fourth Disclaimer and are "not eligible for . . . rescission consistent with ICA procedures," GAO, B-337375, at *8. That means any rescission proposal sent to Congress for the Formula Funds would be invalid, and Defendants could not avail themselves of the ICA provision that allows an agency to refrain from obligating funds for 45 days while Congress considers a rescission proposal. 2 U.S.C. § 683(b). In other words, Defendants mandatory legal duties to make grants and allot the Formula Funds to states would not be affected should Defendants attempt to circumvent those duties by submitting a rescission proposal to Congress. The Court should accordingly enjoin Defendants' action, and require they obligate the Formula Funds to states immediately, no matter whether a rescission proposal is submitted to Congress during the pendency of this motion.

**II. Plaintiffs Will Suffer Irreparable Injury Absent Preliminary Relief**

Plaintiffs rely on the Formula Funds to provide the very high-quality educational programs to low-income and other underserved populations mandated by the ESEA. The Department's failure to release the funds on July 1 has already injected chaos and uncertainty

into School Districts' budgets and planned academic activities and threatened the jobs of

instructors nationwide—all to the detriment of the students they serve. The scaling back or

elimination of educational programs, the teacher layoffs, and the disruption to students' learning

caused by Defendants' actions undoubtedly constitutes irreparable harm. *See New York*, 769 F.

Supp. 3d at 143 (finding irreparable harm resulted from cuts to various education programs

because of a freeze in federal funds); *see also Maine v. USDA*, No. 1:25-cv-00131, 2025 WL

1088946, at *26 (D. Me. Apr. 11, 2025) (finding irreparable harm to beneficiaries and employees

of programs that rely on federal funds that assist school children).

    *School Districts.* Normally, the school districts would have started spending the money

provided by the Formula Grant Programs weeks ago—beginning on July 1 following the start of

their fiscal year and in advance of the school year. Having access to the Formula Funds now is

crucial to allow school districts to be prepared for day one of classes. The entire federal-state

funding scheme is built around that assumption, *supra* 13-14, and school districts have been

planning and seeking state approval of their budgets in reliance on federal funds for ESEA

programs becoming available July 1. But because of the withholding of funds for these Formula

Grant Programs, states have withheld full approval of school districts' budgets, and the school

districts cannot incur the expenses they had budgeted under the Formula Grant Programs. *See*

Gustin Decl. ¶¶ 11-30; Aguillard Decl. ¶¶ 15-30; Meinert Decl. ¶¶ 12-26; Bryantt Decl. ¶¶ 11-

25.

    So this year, instead of preparing teachers and students for the upcoming school year,

school districts are canceling staff and planned activities, and reevaluating their budgets—with

only weeks to go before classes start. *See, e.g.*, Bryantt Decl. ¶ 33 (explaining that the Anchorage

School District has had to shift its attention from "strategic instructional initiatives" to "ensur[e]

effective teaching and learning for all students . . . toward emergency budget realignments and crisis management"). The Anchorage School District, for instance, has terminated support personnel who work with English language learners, canceled educator training sessions traditionally held in July and August, and scaled back its Migrant Education Program. *Id.* ¶¶ 26-27. Cincinnati Public Schools has paused contracts to update curriculum and provide translation services and is preparing to delay or significantly pare back its year-long teacher training program that was supposed to start on August 1. Smith Decl. ¶¶ 11-14. Fairbanks School District has paused all hiring for vacant positions and is considering laying off hard-to-fill positions for teacher instructional coaches and tutors for the migratory children, among others, potentially resulting in 200 fewer trained professionals serving students in Fairbanks by October. Meinert Decl. ¶¶ 30-31. Kuspuk School District is figuring out how it will cover the cost of several major summer programs designed to engage students in remote regions, including migratory children, and for which it had already purchased supplies, hired staff, and coordinated complex logistics. Aguillard Decl. ¶ 31.

The harms caused by these budget disruptions are devastating to the school districts and the children they serve. For example, the Kuspuk School District in rural Alaska operates across roughly 12,000 square miles of roadless terrain, serving children in villages accessible only by air or river travel. Aguillard Decl. ¶ 8. Kuspuk schools are the sole providers of gyms, libraries, recreational facilities, and other opportunities for children in the geographic area. *Id.* ¶ 9. Fifteen percent of students are identified as experiencing homelessness and 15% are English language learners. *Id.* ¶ 11. Each and every one of its schools supports migratory children. *Id.* The school district is designated as a Regional Educational Attendance area, meaning it serves unincorporated, tax-exempt communities with no local government or revenue base and relies

almost entirely on state and federal funds to operate. *Id.* ¶ 8. The loss of funds, therefore, is devastating to the district. It has no alternative funding source to backfill these essential programs, *id.* ¶ 31, which provide (among other services) books to students, support for teacher transportation costs to the hard-to-reach area, and emergency alert systems for communities that have unreliable Wi-Fi access, *id.* ¶ 14. And in a remote area where teacher recruitment and retention is particularly difficult, the loss of qualified professionals caused by a lack of funds for salaries and professional development is not easily recoverable. *Id.* ¶ 36.

For all school districts, such interference with their teacher retention efforts and direct student services are significant and enduring. Cuts to the schools' programs will harm teacher retention and development efforts for school districts that are already contending with high turnover, *see* Bryantt Decl. ¶ 30, and disrupt learning for students who already face challenges because of their low-income status, *e.g.*, *id.* ¶ 31. Even if funds are restored later, reimplementing logistically involved training programs, tutoring services, and other highly coordinated services such as Cincinnati Public Schools' welcome centers is a significant undertaking. *See* ---Smith Decl. ¶ 21. Withholding these funds thus sets back school districts' efforts to provide a high quality education to all children by not just weeks or months, but years.

*Teachers Union Members.* The Teachers Union members include teachers, tutors, instructional coaches, and other educational staff whose salaries are funded in full or in part with funds provided by the Formula Funds. *See* Applebee Decl. ¶¶ 10, 15, 18 (New York Union members' salaries paid with various Formula Funds); Cropper Decl. ¶¶ 6-7 (same for the Ohio Union); Capo Decl. ¶¶ 6-11 (same for the Texas Union); Montgomery Decl. ¶¶ 6, 8, 11, 14 (same for the Illinois Union); Freitas Decl. ¶¶ 9, 20, 22, 24 (same for the California Union); Coleman Decl. ¶¶ 9, 11, 14 (same for the Pennsylvania Union); Calabro Decl. ¶¶ 13, 15-16.

Teachers Union members thus face the imminent, unexpected job losses. Some districts have already laid off teachers due to Defendants' actions. Eleven members of the Rhode Island Union were recently informed that they were losing their jobs. Calabro Decl. ¶ 22. Members of the Illinois Union who teach at Peoria Public Schools District 150 are affected by new cuts and vacancies of at least 25 positions ranging from social workers to behavior facilitators to teacher aids. Montgomery Decl. ¶ 14.

In other districts where the Teachers' Union members work, job losses or changes in responsibilities are imminent. In California, for instance, the Pajaro Valley Unified School District is moving migrant education specialists to other positions and preparing for their eventual termination if funds are not restored. Freitas Decl. ¶ 17. Likely cuts to an afterschool club focused on mental well-being at a school district in Pennsylvania puts a Pennsylvania Union member's job at risk. Coleman Decl. ¶ 15. Texas Union members who are employed with Title I-C funds will likely lose their jobs because the districts have no extra excess in their general funds to support those salaries. Capo Decl. ¶ 8. Many New York Union members' jobs are funded by the Formula Grant Programs and they are therefore just as likely to imminently lose their jobs. Applebee Decl. ¶¶ 15, 18-19.

Members who are able to retain their positions will not have the same high-quality resources at their disposal to effectively instruct students, especially those such as migratory students or English language learners who have particularized needs. For instance, Formula Funds have allowed the Pennsylvania Union members in the School District of Philadelphia to access new and updated materials for English learners, including hand-held electronic translation devices that have revolutionized the way students are able to engage in the classroom and with peers that speak other languages. Coleman Decl. ¶ 12. In California, cuts to teaching supplies,

field trips, and enrichment programs in school districts will make it more difficult for California Union members to teach and students to learn. Freitas Decl. ¶ 11. In other school districts where various Teachers Union members work, similar cuts to learning materials will interfere with teachers' ability to provide high quality instruction. Applebee Decl. ¶ 16 (discussing homework clubs in New York funded by Title III-A grants); Coleman Decl. (specialized instructional materials in Pennsylvania purchased with Title II-A funds); Montgomery Decl. ¶¶ 11-12 (instructional materials for English language learners in Illinois funded by Title III-A grants). And the larger class sizes resulting from fewer teachers will undermine teachers' ability to provide quality instruction, especially for students who are already underperforming or have particular needs such as focused English language assistance. Capo Decl. ¶ 19; Cropper Decl. ¶ 12; Montgomery Decl. ¶ 10; Coleman Decl. ¶¶ 9, 23; Freitas Decl. ¶ 25; Calabro Decl. ¶ 23.

Members will also lose training and mentorship that is critical to helping them help and their students succeed in the areas to which Congress directed support with the Formula Funds. The Three Village Central School District may be forced to cut robust induction and mentoring programs for new teachers, many of whom are members of the New York Union, precisely at a time when a higher than usual number of teachers are entering the workforce in that district and the mentorship is needed most. Applebee Decl. ¶ 14. At least one Ohio school district has already frozen funds for professional development. Cropper Decl. ¶ 10. Other school districts will be forced to make cuts, which will leave teachers without professional development opportunities or force them to pay for training out of pocket. *See* Capo Decl. ¶¶ 6-7; Montgomery Decl. ¶ 10; Coleman Decl. ¶¶ 19, 21-22; Freitas Decl. ¶¶ 18, 21, 26.

*Florida PTA and P.S. 305*. The Florida PTA is the largest statewide volunteer-led child advocacy association working exclusively on behalf of children and youth, with close to 200,00

dues-paying members. Bruno Decl. ¶ 4. Its members include parents, teachers, and students whom the Formula Grant Programs are intended to support. *Id.* ¶¶ 8-21. For example, the child of a PTA member in Miami-Dade county receives English language learners instruction supported by Title III-A. *Id.* ¶ 10. Another child of a PTA member in Miami-Dade is part of the migrant program supported by Title I-C. *Id.* ¶ 11. A PTA board member, Andrew Vaughn, has four children in Florida public schools that benefit from the funds at issue, including teacher development funds supported by Title II-A and enrichment programs supported by Title IV-B. *Id.* ¶ 12. As a result of the Department's actions, school districts such as Miami-Dade have stopped filling open positions, not purchased textbooks, and paused travel funds for teachers. *Id.* ¶ 28. If these funds continue to be withheld, Florida's students will lose academic opportunities and Florida's teachers will lose their jobs. *Id.* ¶ 26-27. The PTA will also need to divert resources from other areas that support students and family engagement to make up for the money not being released. *Id.* ¶ 24.

P.S. 305, a nonprofit educational advocacy organization in Miami-Dade, will similarly need to redo its strategic plan for the upcoming school year, preventing it from performing the advocacy and leadership-development work it would engage in if the Department released the funds as expected. Hosseini Decl. ¶¶ 13-16. It would need to shift its resources to crisis support, including helping its parents who would be harmed by cuts in programs for English learners, enrichment programming, and teacher development. *Id.* Because learning builds from year to year, the educational losses resulting from cuts to programs and staff are irreparable; having to rely on outdated textbooks, go without translation services, or lose the individualized support that larger class sizes prohibit affect the opportunities students have not just for one academic year, but for a lifetime.

### III.    The Balance of Equities and the Public Interest Favor Plaintiffs

The balance of equities weighs heavily in favor of a preliminary injunction. "[T]here is 'substantial public interest in having governmental agencies abide by the federal laws.'" *Massachusetts*, 2025 WL 702163, at *32 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (internal quotation marks omitted). Conversely, of course, "there is no public interest in upholding unlawful agency action," because "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Id.* (internal quotation marks and citation omitted).

A preliminary injunction would simply return Defendants to practices in place for decades and hold Defendants to their non-discretionary duties required by law. The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required[.]" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Thus, "Defendants are not harmed where [an] order requires them to disburse funds that Congress has appropriated." *New York*, 769 F. Supp. 3d at 146 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

The weighty interest in serving students across the contrary removes any doubt that an injunction is needed. "[E]ducation is perhaps the most important function of state and local governments." *Plyler v. Doe*, 457 U.S. 202, 222 (1982) (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954); "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). Congress certainly recognized the public interest in schools receiving the Formula Funds; that is why Congress mandated that the Department distribute the funds prior to an academic year, pursuant to precise formulas. Plaintiffs' declarations bring the interests at stake here to light, and make clear the irreparable

harms that will occur should this funding remain withheld. *Supra* 35-41; *see also Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 130 ("Because the public's interest in not having trillions of dollars arbitrarily frozen cannot be overstated, Plaintiffs have more than met their burden here.").

## IV.    The Court Should Enter Appropriate Preliminary Relief

Because Plaintiffs are likely to succeed on their APA claims, the Court should preliminarily set aside or stay Defendants' actions as to all of the Formula Funds for all states. There are two mechanisms by which this Court may grant such relief.

First, a court may stay challenged agency action pending judicial review when "necessary to prevent irreparable injury." 5 U.S.C. § 705 (authorizing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings"). A section 705 stay "operates upon the [agency action] itself by halting or postponing some portion of [it], or by temporarily divesting a rule or policy of enforceability." *Orr v. Trump*, No. 1:25-cv-10313, 2025 WL 1145271, at *23 (D. Mass. Apr. 18, 2025), *appeal pending*, No. 25-1579 (1st Cir.); *accord, e.g., Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (holding that "[n]othing in the text of Section 705" suggests that preliminary relief under that provision "needs to be limited" to plaintiffs), *cert. granted on other question*, 145 S. Ct. 1039 (2025); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 971 (D. Md. 2020). This corresponds to the "normal" scope of final relief in a successful APA challenge, which is vacatur of the [challenged agency action] and its applicability to all who would have been subject to it." *Woonasquatucket*, 2025 WL 1116157, at *25; *see also, e.g., Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

Second, as Justice Kavanaugh recently explained, "in cases under the Administrative Procedure Act," courts may "preliminarily 'set aside'" an agency action. *CASA*, 2025 WL 1773631, at *19 (Kavanaugh J., concurring). Under 5 U.S.C. § 706(2), courts must set aside agency actions that violate the APA, and it is well established that "when a federal court sets aside an agency action, the federal court vacates that [action]—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post,* 603 U.S. at 830 (Kavanaugh, J., concurring); *see also Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); Tr. of Oral Argument at 35, *United States v. Texas*, No. 22-58 (U.S. Nov. 29, 2022) (Roberts, C.J.) (describing vacatur as "established practice under the APA" that "those of us who were on the D.C. Circuit, do, you know, five times before breakfast, that's what you do in an APA case"). If courts may vacate an agency action upon a final judgment, courts may also provide that relief on an interim basis upon a showing of likelihood of success. *CASA*, 2025 WL 1773631, at *19.

The Supreme Court's recent decision regarding universal injunctions in *Trump v. CASA* is not to the contrary. The Court expressly noted that its holding did not address courts' remedial authority under the APA. 2025 WL 1773631, at *8 n.10; *see also id.* at *19 (Kavanaugh, J., concurring). The Court's holding was purely based on its interpretation of the Judiciary Act of 1789; the Court found that the Act did not provide district courts "equitable authority to issue universal injunctions." *Id*. at *5. As Justice Kavanaugh has explained, even if "equitable relief is ordinarily limited to the parties in a specific case[,] in the APA, Congress did in fact depart from that baseline and authorize vacatur." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring). The APA, in other words, provides statutory authority to block agency action nationwide.

If, however, the Court limits preliminary relief to Plaintiffs, the only way to provide "complete relief" to Plaintiffs is to order Defendants to provide the full amount of Formula

Funds that became available on July 1 to the states in which Plaintiffs are located. *CASA*, 2025 WL 1773631, at *10. It is simply not possible to craft a remedy for Plaintiffs' injuries that is "complete *and* benefits only the named plaintiffs." *Id.* at *11 n.12. To remedy each Plaintiff's injuries, the Defendant must release all Formula Funds to the state where that Plaintiff is located, so that the state can then provide the funds to LEAs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion, preliminarily stay or set aside Defendants unlawful actions, and enter a preliminary injunction.

July 21, 2025                            Respectfully submitted,

*/s/ Miriam Weizenbaum*
Miriam Weizenbaum (RI Bar # 5182)
DeLuca, Weizenbaum, Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
Miriam@dwbrlaw.com

*/s/ Steven Y. Bressler*
Steven Y. Bressler (D.C. Bar No. 482492)[+]
Kali Schellenberg (MA BBO No. 694875)[+ ^]
Skye Perryman ( D.C. Bar No. 984573)+
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kschellenberg@democracyforward.org
sbressler@democracyforward.org

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar # 1016621)[+]
Lynn D. Eisenberg (D.C. Bar No. 1017511)[+]
Kyla M. Snow (OH Bar No. 96662)[+ ^]
John Robinson (D.C. Bar No. 1044072)[+]
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
Dan@jacobsonlawyersgroup.com

*Counsel for All Plaintiffs*

Robert T. Reilly, Jr. (NY Bar # 2598514)[+]
52 Broadway, 9th Floor
New York, NY 10004
(518) 213-6000
Robert.Reilly@nysut.org

*Counsel for Plaintiff New York State United Teachers*

+ *Pro hac vice* motion forthcoming
^ Not admitted to the D.C. Bar, practicing under supervision of D.C. Bar members